[S. F. No. 19190. In Bank. Apr. 28, 1955.]

JEANNE DORAN et al., Appellants, v. CITY AND COUNTY OF SAN·FRANCISCO, Respondent.

[S. F. No. 19191. In Bank. Apr. 28, 1955.]

JULES BESSETTE, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO, Respondent.

478

Fitz-Gerald Ames, Sr., and Harold A. Galloway for Appellants.

Dion R. Holm, City Attorney, and Jerome Cohen, Deputy City Attorney, for Respondent.

SPENCE, J.—This is a consolidated appeal by plaintiffs in two personal injury actions which were separately tried but which arose out of the same accident. It is submitted on two separate settled statements, which are substantially the same in their presentation of the evidence and are so treated by counsel for plaintiffs in discussing the legal points in the joint briefs presented on plaintiffs' behalf. Plaintiff Doran appeals from an order granting a new trial after judgment in her favor. Plaintiff Bessette appeals from a judgment in favor of defendants.

In the Doran case the trial court instructed the jury on the last clear chance doctrine, and then granted a new trial solely on the ground that it had erred in giving that instruction. In the Bessette case the trial court refused to instruct on that doctrine. Plaintiffs contend that the last clear chance instruction was properly given in the Doran case, and that therefore the order granting defendants' motion for a new trial in that case should be reversed. They further contend that the requested instruction on the last clear chance doctrine should have been given in the Bessette case, and that there-

fore the judgment in favor of defendants in that case should be reversed. While defendants make no objection to the form of plaintiffs' requested instructions, they maintain that the evidence was insufficient to justify the giving of the last clear chance instruction in either case, and that therefore the order and judgment should be affirmed. The evidence was substantially the same in both cases but viewing that evidence in the light most favorable to plaintiffs (*Rodabaugh* v. *Tekus*, 39 Cal.2d 290, 291 [246 P.2d 663]; *Daniels* v. *City & County of San Francisco*, 40 Cal.2d 614, 617 [255 P.2d 785]), we have nevertheless concluded that defendants' position must be sustained.

On March 17, 1950, about 7:30 p. m., plaintiffs were struck by defendants' electric overhead trolley bus as they were crossing Union Street at a point approximately 120 feet west of the intersection with Fillmore Street, in San Francisco. Plaintiff Jules Bessette, accompanied by plaintiff Jeanne Doran, had parked his automobile on the south side of Union Street, about 100 feet west of Fillmore. Union Street is relatively narrow, being 44 feet 9 inches from curb to curb, and there were cars parked at the curbs on both sides. After leaving their car and proceeding west on the sidewalk about a car's length, plaintiffs stepped into Union Street intending to cross the street to a theatre on the opposite (north) side. Defendants' trolley bus, traveling west on Union Street, had crossed Fillmore and stopped in front of a drugstore on the northwest corner of the intersection. There were two sets of streetcar tracks on Union Street, and the bus was stopped parallel to the curb with its right wheels just to the right of the most northerly rail of the car tracks. Plaintiffs testified that after they had stepped into Union Street and were a few feet from the south curb, they stopped, "looked around," observed the bus stopped to their right at the corner but saw no moving traffic, and then proceeded straight, not diagonally, across the street. When they reached the center of the street and were between the two sets of tracks, they looked again to the right and saw the bus moving in their direction. When plaintiff Bessette saw the bus for the second time, he "could not tell if it moved any distance from the point where he first saw it when it was stopped." Plaintiff Doran testified: "When I was in the middle of the street, I don't know how far the bus was from me. I know the bus was going in my direction. . . . I cannot tell you if it had gone half way. I don't know if it was as close as 10

feet to me when I saw it the second time. As I was crossing the street, I know the bus was coming in my direction but I don't know whether the bus was going to stop or would continue to go along.'' Neither plaintiff looked again in the direction of the bus, but they continued to walk into its path. Their memory of events ends there.

The bus driver testified that he was traveling between 15 to 20 miles per hour when he first saw plaintiffs running diagonally across the street. At that time they were 15 to 20 feet ahead of the bus, 3 feet to its left and in the center of the street, looking straight ahead in the direction in which they were going. The bus headlights were on low beam. The street lights and the theatre marquee and sign lights were burning. Looking ahead from his stopped position at the corner in front of the drugstore, the bus driver could see parked cars the full length of the block on both sides of the street; and there was nothing in the street to obstruct his view. After starting the bus, he traveled some two or three coach lengths (a coach length is 35 feet) before he saw plaintiffs. He then immediately applied his brakes and swerved to the left, but the right front half of the bus struck plaintiffs. The bus traveled 4 to 6 feet between the point of impact and the stop. Traveling at the speed of 15 to 20 miles per hour when he first saw plaintiffs, he stated that he could stop the bus within 23 to 26 feet, including reaction time. He did not sound his horn but used both hands to turn the steering wheel in an effort to avoid striking plaintiffs. He could not state why he did not see plaintiffs sooner in the street, except for these prevailing circumstances: plaintiffs were wearing semi-dark clothing—plaintiff Doran in a dark brown coat, white blouse and beige skirt, and plaintiff Bessette in a gray suit and ''sort of brown'' overcoat; the stores on both sides of the street, excepting the corner drugstore and the theatre, both on the north side, were dark; and the southerly part of Union Street was a dark background at approximately the spot where he first saw plaintiffs.

It thus appears that the only real conflict in the evidence was on the question of whether plaintiffs walked straight, or ran diagonally, across the street and into the path of the bus. Accepting plaintiffs' testimony, it will be assumed that they walked straight across. But plaintiffs' own testimony further showed that they did not stop at any time in making such crossing, and that they saw the approaching bus when they were at the center of the street. Their own exhibits

(plaintiff Doran's Exhibits 1, 4, 5, and 7 and plaintiff Bessette's Exhibit 1) left no doubt as to the place where the accident occurred. The point of impact was shown to have been at a point near the center of the street, and no further north than the center of the westbound tracks, which was approximately 6 feet from the center of the street. Hence plaintiffs' own testimony affirmatively showed that there could not possibly have been any appreciable interval between the time that they left a place of safety and the time that the accident occurred. In this situation it is understandable that plaintiffs should have admitted that they did not know how far the bus was from them when they were at the center of the street or how many steps they took after passing the center of the street; and in the light of these admissions and the abovementioned admitted facts, any testimony of plaintiffs to the effect that the bus was still at the corner (about 120 feet away) and was just starting to move at the time that plaintiffs crossed the center of the street is inherently improbable as it cannot be reconciled with the happening of the accident. Such testimony therefore cannot be deemed to be substantial evidence on that subject.

 Whether or not the doctrine of last clear chance applies in a particular case depends wholly upon the existence or nonexistence of the elements necessary to bring it into play. The doctrine presupposes: ''(1) That plaintiff has been negligent and, as a result thereof, is in a position of danger from which he cannot escape by the exercise of ordinary care; and this includes not only where it is physically impossible for him to escape, but also in cases where he is totally unaware of his danger and for that reason unable to escape; (2) that defendant has knowledge that the plaintiff is in such a situation, and knows, or in the exercise of ordinary care should know, that plaintiff cannot escape from such situation; and (3) has the last clear chance to avoid the accident by exercising ordinary care, and fails to exercise the same, and the accident results thereby, and plaintiff is injured as the proximate result of such failure.'' (*Daniels* v. *City & County of San Francisco, supra,* 40 Cal.2d 614, 619.) If any one of these elements is absent, the doctrine does not apply and the case is governed by the ordinary rules of negligence and contributory negligence. (*Palmer* v. *Tschudy,* 191 Cal. 696, 700 [218 P. 36].)

Defendants contend that the doctrine is not applicable here because plaintiffs were aware of their dangerous position and

could have saved themselves by the exercise of ordinary care. Concededly, plaintiffs were guilty of negligence in crossing the street in the middle of the block directly in the path of the oncoming bus. They saw the bus shortly after leaving the curb. They again looked to their right and saw the bus approaching when they were in the center of the street, but nevertheless they continued on their way without again glancing in that direction. Defendants therefore maintain that it cannot be said that plaintiffs, after seeing the approaching bus and then stepping into its path, were "totally unaware" of their dangerous position within the purview of the last clear chance doctrine.

In their effort to answer defendants' contention relating to the first required element, plaintiffs apparently realize that they cannot claim that they were in a position of danger from which it was "physically impossible" for them to escape until after they had passed the center of the street and had stepped directly into the path of the oncoming bus. They therefore rely mainly upon their claim that they were "totally unaware" of their danger. This latter claim finds no support in the evidence. Plaintiffs concededly knew of the presence of the bus as they started to cross the street, and also knew that it was moving toward them when they again looked to the right while near the center of the relatively narrow street. With this knowledge, they proceeded to step directly into the path of the oncoming bus; and in the light of this admitted knowledge, it cannot be said that plaintiffs were "totally unaware" of their danger. Total unawareness of danger, as contemplated by the doctrine, does not exist where the injured party is fully aware of the approach of an oncoming vehicle up to the instant before the collision and then shifts his attention to look in some other direction while proceeding directly into its path.

Plaintiffs have cited no case in which the last clear chance doctrine has been held applicable to any comparable factual situation. On the contrary, in a case which is closely parallel on its facts, it was held that the doctrine was not applicable. (*Palmer* v. *Tschudy, supra,* 191 Cal. 696.) There the plaintiff, a pedestrian, upon reaching the curb, glanced to her right and saw defendant's automobile approaching at a distance of approximately 200 feet. She started to cross the street and when she had taken two or three steps from the curb, she again glanced to her right and saw defendant's automobile still approaching and, of course, nearer. Without

again looking at the approaching automobile, she proceeded to cross the street and was struck and injured. The trial court there instructed on the last clear chance doctrine, and the judgment in favor of plaintiff was reversed because of the error in giving such an instruction. This court recognized that the last clear chance doctrine may be applied when the injured party is totally unaware of the danger but held that "plaintiff was aware of it from the beginning." (P. 701.)

Plaintiffs cite numerous cases where the last clear chance doctrine has been held applicable but all are distinguishable on their facts. Some of these cases involved situations where there was evidence to show that the injured person was in fact "totally unaware" of the danger. In *Girdner* v. *Union Oil Co.*, 216 Cal. 197 [13 P.2d 915], the trial court found upon sufficient evidence that "up to the time of the collision, he (plaintiff) did not see and was totally oblivious of the approach of the truck, and the danger that confronted him." (P. 200.) In *Center* v. *Yellow Cab Co.*, 216 Cal. 205 [13 P.2d 918], the evidence showed that the plaintiff "did not see the approach of the automobile that struck him." (P. 206.) And in the more recent decision of *Peterson* v. *Burkhalter*, 38 Cal.2d 107 [237 P.2d 977], there was evidence to show that the injured boy did not see the defendant's oncoming automobile. The boy in approaching the intersection on his motor scooter and while 75 feet therefrom was "looking over his right shoulder in the opposite direction," and as he neared the intersection he "was still looking over his right shoulder." (P. 109.) Other cases cited by plaintiffs involved situations where there was evidence to show that the vehicle in which the injured person was traveling was either stalled or stopped practically directly in the path in which defendant was traveling. (*Selinsky* v. *Olsen*, 38 Cal.2d 102 [237 P.2d 645]; *Daniels* v. *City & County of San Francisco*, *supra*, 40 Cal.2d 614; *Sills* v. *Los Angeles Transit Lines*, 40 Cal.2d 630 [255 P.2d 795].) It thus appears that in each of the cited cases there was evidence from which the trier of the facts could find that plaintiff's negligence had placed him in a position of danger from which he could not escape by the exercise of ordinary care either (1) because it was "physically impossible for him to escape" or (2) because he was "totally unaware of his danger and for that reason unable to escape." Under such circumstances, there was no lack of evidence to support a finding of the presence of the first required element for the application of the last clear

chance doctrine. Of course, in each of said cases, it was also held that there was sufficient evidence to support a finding that defendant had actual knowledge that plaintiff was in such a situation, and that defendant thereafter had a "last clear chance to avoid the accident by exercising ordinary care" but failed to do so.

It would serve no useful purpose to review all of the authorities dealing with the applicability of the last clear chance doctrine. Many of them have been reviewed in the recent decisions of this court, and it has been recognized that some cases have "presented close questions concerning the sufficiency of the evidence to warrant the application of the doctrine." (*Rodabaugh* v. *Tekus, supra,* 39 Cal.2d 290, 297.) It was further stated in the earlier case of *Girdner* v. *Union Oil Co., supra,* 216 Cal. 197, 202-203, that any "apparent confusion which exists in some of the decisions upon the subject arises in the application of the law to the facts, but as to the rule itself there is little or no confusion." A summary of the rules established by the recent cases may serve to dispel any apparent confusion that may be said to exist by reason of certain earlier decisions.

The ordinary case presenting the issues of negligence and contributory negligence is governed by the traditional rules which cover those issues, and which make contributory negligence a bar to recovery by the injured party. ▪ The last clear chance doctrine, which relieves an injured party of the results of his own contributory negligence and permits him to recover despite such negligence, is applicable only in the exceptional case in which there is substantial evidence to support a favorable finding on each of the several required elements above enumerated. ▪ And as above indicated, if any one of these elements is absent, the doctrine does not apply and the case is governed by the ordinary rules of negligence and contributory negligence. (*Palmer* v. *Tschudy, supra,* 191 Cal. 696, 700; *Rodabaugh* v. *Tekus, supra,* 39 Cal. 2d 290, 293; also *Girdner* v. *Union Oil Co., supra,* 216 Cal. 197, 202; *Daniels* v. *City & County of San Francisco, supra,* 40 Cal.2d 614, 619; *Sills* v. *Los Angeles Transit Lines, supra,* 40 Cal.2d 630, 635.) ▪ In this connection, it should be emphasized that the "continuing negligence" of the injured party does not deprive him of the benefit of the last clear chance doctrine if all the required elements for the application of that doctrine are present, for such "continuing negligence" ordinarily exists in all last clear chance cases. (*Girdner* v.

*Union Oil Co., supra,* 216 Cal. 197, 203; *Center* v. *Yellow Cab Co., supra,* 216 Cal. 205, 207-208; *Selinsky* v. *Olsen, supra,* 38 Cal.2d 102, 104-105; *Peterson* v. *Burkhalter, supra,* 38 Cal.2d 107, 111.)

The question of whether there is any substantial evidence, conflicting or otherwise, which could justify the application of the last clear chance doctrine in a given case, is a question of law; and in the absence of such evidence, it is error for the trial court to instruct the jury concerning that doctrine. (*Wallis* v. *Southern Pac. Co.,* 184 Cal. 662, 672 [195 P. 408, 15 A.L.R. 117]; *Rodabaugh* v. *Tekus, supra,* 39 Cal.2d 290, 297; *Johnson* v. *Sacramento Northern Ry.,* 54 Cal.App.2d 528, 543 [129 P.2d 503]; *Dalley* v. *Williams,* 73 Cal.App.2d 427, 431-432 [166 P.2d 595].) On the other hand, if there is such substantial evidence, conflicting or otherwise, the question of whether the defendant should be held to have had a last clear chance to avoid the accident is a question of fact to be determined by the jury under appropriate instructions. (*Girdner* v. *Union Oil Co., supra,* 216 Cal. 197, 204; *Center* v. *Yellow Cab Co., supra,* 216 Cal. 205, 208; *Selinsky* v. *Olsen, supra,* 38 Cal.2d 102, 106; *Peterson* v. *Burkhalter, supra,* 38 Cal.2d 107, 113; *Daniels* v. *City & County of San Francisco, supra,* 40 Cal.2d 614, 619, 622-623; *Sills* v. *Los Angeles Transit Lines, supra,* 40 Cal.2d 630, 635-636, 638.)

While the determination of the question of law abovementioned is not free from difficulty in certain borderline cases, the cited authorities show that the courts have not hesitated to hold that the doctrine could be applied whenever it may be fairly said that there is substantial evidence, conflicting or otherwise, upon which to base a finding of the presence of each of the required elements. These authorities recognize, however, that it is only the exceptional case to which the doctrine may be applied, and that the mere fact that there is ample evidence to show that a defendant is negligent, without substantial evidence of the existence of the other required elements, will not warrant the application of the last clear chance doctrine. (*Rodabaugh* v. *Tekus, supra,* 39 Cal.2d 290, 293.)

The underlying basis for the application of this doctrine, which permits an injured person to recover despite his continuing and contributory negligence, is that defendant was afforded a *last* chance and a *clear* chance to avoid the accident *after* defendant had discovered that plaintiff was

in a helpless situation. It is based upon the humanitarian concept that the fault of the injured party should not relieve the erring defendant of his liability if defendant is afforded such last clear chance to avoid the accident after actually discovering that it is too late for the injured party to avail himself of any similar chance. ■■■ But the chance which is afforded to defendant must be something more than a bare possible chance. It must be not only a *last* chance but a *clear* chance, following actual knowledge of plaintiff's helplessness, to avoid the accident by the exercise of ordinary care; and, by its very terms, the doctrine excludes from its application any case in which plaintiff's state of helplessness, resulting from his own negligence, is created so nearly simultaneously with the happening of the accident that neither party may be fairly said to have thereafter a last clear chance to avoid the accident. (*Rodabaugh* v. *Tekus, supra,* 39 Cal.2d 290, 294-296; *Poncino* v. *Reid-Murdock & Co.,* 136 Cal.App. 223, 229-232 [28 P.2d 932] ; *Johnson* v. *Sacramento Northern Ry.,* *supra,* 54 Cal.App.2d 528, 532, 542.)

In applying the foregoing principles, it is helpful to bear in mind the decisions which rationalize the last clear chance doctrine in terms of proximate cause. (*Girdner* v. *Union Oil Co., supra,* 216 Cal. 197, 204; *Center* v. *Yellow Cab Co., supra,* 216 Cal. 205, 207-208; *Sparks* v. *Redinger, ante,* p. 121 [279 P.2d 971].) ■■■ As was said in the Center case at pages 207-208: "The doctrine of (plaintiff's) continuing negligence has no application unless the negligence is the proximate cause of the injury. ■■■ *If all the elements of the doctrine of the last clear chance are present and plaintiff's negligence becomes remote in causation, then the doctrine applies.* If, on the other hand, any of the elements of the doctrine are lacking, courts have declared, and rightfully so, that plaintiff's negligence being continuous and contributory with that of defendant bars a recovery." (Emphasis added.)

Thus, the doctrine may be applied only if it may fairly be said that plaintiff's negligence was "remote in causation." ■■■ What then is the main factor which may make plaintiff's negligence, in the eyes of the law, a remote cause rather than a proximate cause of the accident? It is obviously the existence of some such appreciable interval after the time that plaintiff has reached a state of helplessness as to enable defendant to gain actual knowledge of plaintiff's state of helplessness, and to have a last clear chance to avoid the accident. And as above indicated, such state of helplessness

is reached only when plaintiff's negligence has placed him "in a position of danger from which he cannot escape by the exercise of ordinary care" either (1) because it is "physically impossible for him to escape" or (2) because he is "totally unaware of his danger and for that reason unable to escape." ■■■ Accordingly, when a plaintiff is actually aware of the approach of an oncoming vehicle and when his negligent act, which removes him from a position of safety and into a position of danger, occurs almost simultaneously with the happening of the accident, there can be no such appreciable interval thereafter as to enable defendant to gain knowledge of plaintiff's helplessness and to have a *last clear chance* to avoid the accident. In such case, the negligence of plaintiff cannot be deemed to be "remote in causation." On the contrary, such negligence is, in the eyes of the law, a proximate cause of the accident, and the last clear chance doctrine has no application.

In the light of the above discussion, it appears clear that the cases involved on this appeal presented no substantial evidence upon which to predicate the application of the last clear chance doctrine. We have heretofore indicated that there was no evidence to show that plaintiffs were totally unaware of the danger, for they testified that they saw the approaching bus twice after leaving the south curb—first immediately after leaving the south curb and again when in the center of the street. It is also clear that plaintiffs cannot successfully claim that defendants had a last clear chance to avoid the accident *after* plaintiffs had left their position of safety near the center of the street and stepped into a position of danger. ■■■ Plaintiffs were not in a position of danger nor in a state of helplessness, within the meaning of the doctrine, until they had reached a point where they could no longer escape by the exercise of ordinary care. ■■■ As was said in *Dalley* v. *Williams, supra,* 73 Cal.App. 2d 427, at page 435, "the term 'place of safety' ordinarily includes the position of the plaintiff while he is merely *approaching* the place of danger, and so long as he is only *approaching* but is not actually *in* a position of danger, the plaintiff cannot invoke the doctrine."

■■■ The distance from the center of the street to the north curb was but 22 feet 4½ inches. There were automobiles parked along the curb, thus leaving only the intervening space for the bus to operate along the northerly half of the street, where the accident occurred at a point within

a few feet from the center line of the street. Plaintiffs' state of helplessness was created only by their act of leaving their position of safety near the center of the street and stepping directly into the path of danger. Under any view of the evidence, plaintiffs could not have taken more than two or three steps after leaving a place of safety and before the accident happened. Therefore plaintiffs' act of negligence in leaving a place of safety and stepping directly into the path of the oncoming bus necessarily occurred almost simultaneously with the happening of the accident. Under these circumstances, such negligence cannot be deemed "remote in causation," and it cannot be said that defendants thereafter had a last clear chance to avoid the accident. We therefore conclude that in each of these cases the trial court correctly determined by the challenged ruling that as a matter of law the record presented no substantial evidence to justify the application of the last clear chance doctrine.

In *Doran* v. *City & County of San Francisco,* S. F. 19190, the order granting a new trial is affirmed. In *Bessette* v. *City & County of San Francisco,* S. F. 19191, the judgment is affirmed.

Shenk, J., Edmonds, J., and Schauer, J., concurred.

CARTER, J.—I dissent.

I cannot agree with the majority opinion for several reasons. The first of these reasons is that the facts have not been fairly stated. In determining the propriety of the order granting a new trial and of the refusal to give a requested jury instruction in these cases, the evidence is to be viewed in the light most favorable to plaintiffs. (*Rodabaugh* v. *Tekus,* 39 Cal.2d 290 [246 P.2d 663] ; *Daniels* v. *City & County of San Francisco,* 40 Cal.2d 614 [255 P.2d 785].) The appeal in these cases is presented on settled statements of facts submitted by plaintiffs with amendments proposed by defendants. The excerpts from the settled statements, quoted in the majority opinion, appear to be the excerpts least favorable to the plaintiffs and most favorable to defendant. In some instances the excerpts attributed to plaintiff Doran have been taken from the statement submitted by plaintiff Bessette. They do not appear in the settled statement of facts submitted by plaintiff Doran.

### Testimony of Bessette

From the testimony of plaintiff Bessette as it appears in the settled statement of facts, the majority opinion quotes:

When he ". . . saw the bus for the second time, he 'could not tell if it moved any distance from the point where he first saw it when it was stopped' " Read in the context of the majority opinion, these words seem to imply that plaintiff Bessette simply did not know where the bus was located when he saw it the second time. That inference seems to be the basis for the later statement of the majority that plaintiffs were not totally unaware of the danger because they knew that the bus was moving toward them when they reached the center of the street. Read in the context in which it was submitted to this court in the settled statements of facts, this excerpt conveys a far different meaning. Compare the words quoted in the majority opinion with these statements, which appear in the same settled statements of facts as the testimony of plaintiff Bessette, which the majority opinion apparently ignores:

"We walked about 6 or 7 feet into the street, going north, and then stopped to look for traffic. We saw no moving traffic in either direction, but saw the bus stopped at the corner near the drugstore, with the back wheel of the bus extending into the intersection. The visibility was good and when I looked to my left (west) I was able to see beyond Steiner Street, and was able to see the houses up there."

"We proceeded across the street and when I reached near the center of the street I noticed that the bus was just beginning to move from the stopped position. It 'don'' go hardly at all, it just beginning to move.' (Sic) I continued right across, going straight, not diagonally, and I don't remember what happened after that."

"When I was in the middle of the street I looked to my right to see the bus, what the bus was doing there at the corner. As far as I could see, the bus was just beginning to move."

"The last time I saw the bus it was northwest of Fillmore near the front of the drugstore. When the bus was just starting to move, it was right there in the same place that I was looking the first time. I never saw the bus after that. I know I was walking to the middle of street but after that I don't know what happened to me. When I was at the center of the street I didn't stop but continued to walk. I know I was past the middle of the street when the accident occurred but I don't know how far past."

"When he was looking at the bus again to see what the bus was doing when he reached the center of the street and

saw the bus just starting up, it seemed to him that he had plenty of time to cross.''

''Portions of the witness's testimony given in his deposition were read into the record in which he said: 'I did not see the bus just before it hit me.' He can't say how far he had walked from his position in the center of the street up to the time he was knocked out, because he doesn't really know.''

''He did not recall hearing the sound of a horn, bell or gong or any other sound coming from the bus at any time prior to the accident.''

''That he was wearing some sort of light colored overcoat at the time of the accident. 'Yes, maybe it was a sort of greenish-gray.' ''

''When he first saw the bus, when it was stopped at the corner, it was about 120 or 125 feet away from where he stopped to look for traffic when he was standing about 6 or 7 feet out from the south curb.''

''When he got to the middle of the street he looked to the right and saw the bus again; he could not tell if it moved any distance from the point where he first saw it when it was stopped.''

''When he looked at the bus a second time it was about 120 to 125 feet from him. From the time he left the sidewalk until the time he got to the center of the street the bus hadn't moved any distance at all, it was still in the same place, right there at the corner.''

''I knew the bus was moving in my direction but I did not alter the speed of my walk because I had plenty of time, the bus was so far I took my eyes off the bus and I never looked at it again to see what was happening to it.''

''When he passed the center of the street and saw the bus start to move, he never looked in the direction from which the bus was coming, and never looked at the bus again.''

I believe it is quite clear that the brief excerpt of plaintiff Bessette's testimony appearing in the majority opinion is not a fair statement of the general tenor of his testimony. Wrenched out of context, as it is in the majority opinion, it is perhaps as *favorable to defendant* as any excerpt which could have been found. It obviously does not represent a view of the evidence in the light most favorable to plaintiff.

The majority infers that plaintiff Bessette knew the bus was coming toward him, did not know (nor apparently care) how far away it was, and recklessly stepped into its path. The evidence viewed as a whole indicates to the contrary,

that plaintiff Bessette saw the bus still at the corner, 120 feet away, just beginning to move, and so continued to walk across the street in the mistaken, but reasonable belief that he had plenty of time.

### TESTIMONY OF DORAN

From the testimony of plaintiff Doran, the majority opinion quotes the following excerpts: ''When I was in the middle of the street, I don't know how far the bus was from me. I know the bus was going in my direction. . . . I cannot tell you if it had gone half way. I don't know if it was as close as 10 feet to me when I saw it the second time. As I was crossing the street, I know the bus was coming in my direction but I don't know whether the bus was going to stop or would continue to go along.''

Let us analyze this excerpt one sentence at a time, and compare it with other excerpts from the same settled statements. The first sentence quoted by the majority opinion is ''When I was in the middle of the street, I don't know how far the bus was from me.'' This sentence appeared originally in the settled statement of facts submitted by plaintiff Bessette. It did not appear in the settled statement of facts submitted by plaintiff Doran. Compare the quoted sentence with these statements, referring to the same subject matter, which the majority apparently ignores:

''When we reached the middle of the street between the two sets of tracks I again looked to the right (east) and saw the bus in about the same position, just beginning to move in my direction.''

''I saw the bus a second time when I was about the middle of the street. The bus was in the same position mostly and Mr. Bessette was on my right.''

''Before we got to the middle of the street I was looking and when I was in the middle of the street I was looking again watching the bus.'' ''The bus started to move when I was about in the middle of the street. After I started across the street when I saw the bus down at the corner I next looked to see where the bus was when I was in the middle. After that I didn't look any more.''

The inference which the majority draws from the *single sentence* quoted by it, is that plaintiff Doran did not know how far away the bus was. The inference logically to be drawn from the *whole testimony* is that plaintiff Doran did know about how far away the bus was—she knew that it was still at the corner, about 120 feet away.

The second sentence of plaintiff Doran's testimony quoted by the majority opinion is: "I know the bus was going in my direction. . . ." This sentence also does not appear in the settled statement of plaintiff Doran. Again, however, the majority has ignored these references which seem pertinent:

"When we reached the middle of the street between the two sets of tracks I again looked to the right (east) and saw the bus in about the same position, just beginning to move in my direction."

"When I looked the second time the bus was moving. I can't tell you how close it was to me. I don't know if it had left the position of the nearest corner."

The inference which the majority apparently draws from the sentence which it quotes is that plaintiff Doran saw the bus moving at full speed down the street toward her. The evidence viewed as a whole will not support that inference. A logical inference which may be drawn from the *whole testimony* is that plaintiff Doran saw the bus still at the corner, 120 feet away, just beginning to move.

The third and fourth sentences in the quoted paragraph of the majority opinion were "I cannot tell you if it had gone half way. I don't know if it was as close as 10 feet to me when I saw it the second time." Of the quoted paragraph, these are the first sentences which actually do appear in the settled statement submitted by plaintiff Doran. But compare them with these words, which also appear in plaintiff Doran's statement and which the majority ignored:

"When we reached the middle of the street between the two sets of tracks I again looked to the right (east) and saw the bus in about the same position [about 120 feet away], just beginning to move in my direction."

"The bus was in the same position mostly [about 120 feet away] and Mr. Bessette was on my right."

"The bus started to move [from its position at the corner about 120 feet away] when I was about in the middle of the street."

The majority picks out isolated sentences which imply that plaintiff Doran did not know how far away the bus was; but the majority ignores the many statements in the record that indicate that plaintiff Doran did know that the bus was about 120 feet away when she was at the middle of the street.

The last sentence in the quoted paragraph is "As I was

crossing the street, I know the bus was coming in my direction but I don't know whether the bus was going to stop or would continue to go along.'' Again, there is no such statement in the settled statement submitted by plaintiff Doran. There does not seem to be any direct reference in the statement submitted by plaintiff Doran as to plaintiff Doran's knowledge of ''whether the bus was going to stop or would continue to go along.''

All of these purportedly representative excerpts of plaintiff Doran's testimony were culled by the majority from the statement of facts submitted by plaintiff Bessette. I cannot understand how, if the majority opinion was guided by the controlling principle that the evidence is to be viewed in the light most favorable to plaintiffs, it could have ignored such statements as I have quoted above. On the same page of the Bessette statement that the majority quotes plaintiff Doran as saying, ''When I was in the middle of the street I don't know how far away the bus was from me,'' appears the statement ''When I was in the middle of the street I saw the bus just beginning to move.'' Can it possibly be said that the majority views the evidence in the light most favorable to plaintiffs? Can it be said that the facts have been fairly stated? I think not.

The majority paints a word picture of plaintiff Doran walking to the middle of the street, seeing a large bus bearing down on her, apparently quite close, and blandly stepping in front of it with no idea whether it would stop or not. This picture is but a sadly distorted remnant of the original portrayal which appeared in the evidence. A clearer view shows plaintiff Doran walking to the center of the street; seeing the bus about 120 to 125 feet away, just beginning to move; and continuing across the street with a feeling of apparent safety; only to be struck down by the bus which rapidly covered the intervening distance.

### TESTIMONY OF THE BUS DRIVER

The testimony of the bus driver is summarized in the majority opinion somewhat accurately. Minor discrepancies in the majority's summary include (1) ''. . . he was traveling between 15 to 20 miles per hour when he first saw plaintiffs. . . .'' The testimony was that he was traveling 20 miles per hour when he first saw them. (2) ''Traveling at the speed of 15 to 20 miles per hour when he first saw plaintiffs, he stated that he could stop the bus within 23

to 26 feet, including reaction time.'' The testimony was, ''Under the conditions present at that time and place, with the bus travelling at 20 miles per hour, I could stop that bus within 23 to 26 feet, including reaction time.'' (3) The bus driver did not, as the majority opinion intimates, specify the colors of the clothing worn by plaintiffs.

I believe that a fair statement of the evidence in the light most favorable to plaintiffs would have brought out, as the settled statements of fact did, (1) that the bus driver from his experience in driving along those streets, had found that the dim lights sufficiently lighted up the road for the purpose of operating the bus—that he could see whatever it was necessary to see in operating the bus. (2) That the bus headlights lit up the whole street from curb to curb. (3) That before starting up from the corner he could see right and left and in front. (4) That all of the time, up to the time of impact, he was looking straight ahead. (5) That cars were outlined quite clearly and he had no trouble in seeing them. (6) He had a perfect field of vision (peripheral vision) and 20-20 vision. These facts, coupled with the plaintiffs' testimony that when they were in the middle of the street, the bus was still at the corner, just starting to move, could quite clearly lead to the inference that the bus driver saw the plaintiffs when he was 120 feet away from them (*Selinsky* v. *Olsen*, 38 Cal.2d 102, 105 [237 P.2d 645]; *Hoy* v. *Tornich*, 199 Cal. 545 [250 P. 565]; *Bailey* v. *Wilson*, 16 Cal.App.2d 645 [61 P.2d 68]; *Hellman* v. *Bradley*, 13 Cal.App.2d 159 [56 P.2d 607]). If a jury should draw this inference, there would be little trouble in holding that the last clear chance doctrine is applicable. Clearly that inference could be drawn, and would be upheld on any appeal, since there is evidentiary support for it. A jury would not be bound by the direct testimony of the defendant bus driver. Even less bound by defendant's testimony are we, who are supposed to be viewing the evidence in the light most favorable to plaintiffs.

The majority opinion states that the only real conflict in the evidence was on the question of whether plaintiffs walked straight, or ran diagonally, across the street. Having set up this defenseless ''straw man,'' the majority then strikes it down by magnanimously accepting plaintiffs' testimony that they walked straight across. In the entire majority opinion, this is apparently the only point on which the evidence has been viewed favorably to the plaintiffs, as required by law. (*Rodabaugh* v. *Tekus*, *supra*; *Daniels* v. *City & County of*

*San Francisco, supra.*) Having complied with the law on this one minor point, the majority then apparently feels that it is free to ignore the more significant items of evidence. The majority opinion commences with the above mentioned correct statement, then continues with a distortion of the facts by which the majority seeks to prove that "there could not possibly have been any appreciable interval between the time that they [plaintiffs] left a place of safety and the time that the accident occurred." From the conflicting evidence in the record, the majority assumes that the accident occurred about 6 feet from the center of the street. From this one, isolated fact (which itself was contradicted by the direct testimony of plaintiff Bessette, who testified that to the best of his recollection he took six or seven steps after leaving the center of the street before he was hit) the majority attempts to prove a measure of *time* by use of a statement of *linear* measurement. To prove that no appreciable *time* passed while plaintiffs took the six or seven steps, it would be necessary to know the *rate of speed* at which plaintiffs were walking. The only direct evidence of the rate of speed of plaintiffs' walk is the testimony that they were walking at an *ordinary* walk, and that they didn't hurry, speed up or slow down while crossing the street. The only facts from which their rate of speed could be inferred are the facts that plaintiff Bessette was 74 years old, and that there were street-car tracks in the street. From these facts it could be inferred that an ordinary walk for plaintiff Bessette might be slower than an ordinary walk for a younger, more agile youth. There is no evidence in the record as to the agility or gait of the plaintiffs. Clearly, the majority was forced to make assumptions wholly unwarranted by the record in order to support the decision which it had dogmatically determined it was going to reach.

Continuing with the same paragraph, the majority opinion states: "In this situation it is understandable that plaintiffs should have admitted that they did not know how far the bus was from them when they were at the center of the street or how many steps they took after passing the center of the street; and in the light of these admissions and the above-mentioned admitted facts, any testimony of plaintiffs to the effect that the bus was still at the corner (about 120 feet away) and was just starting to move at the time that plaintiffs crossed the center of the street is inherently improbable as it cannot be reconciled with the happening of the accident.

498

Such testimony therefore cannot be deemed to be substantial evidence on that subject.'' This statement demonstrates the absolute unfairness of the position taken by the majority in order to prevail in this action. It cannot reconcile the conclusion it wants to reach with the factual situation disclosed by plaintiffs' testimony, so it blandly says such testimony is ''inherently improbable.'' In the light of the record before us in this case such a holding is unworthy of a court of justice.

To arrive at its predetermined conclusion the majority is forced to ignore the repeated direct testimony of the plaintiffs that the bus was still at the corner, 120 feet away, when they were at the center of the street. The majority attempts to justify its action by holding that the testimony of the plaintiffs is ''inherently improbable.'' The only support for the charge of inherent improbability is the assumed fact that the accident occurred approximately 6 feet from the center of the street. I submit that there is nothing inherently improbable in plaintiffs' testimony that the bus was still at the corner, 120 feet away, when they were at the center of the street. The evidence clearly indicates that the bus driver started the bus by pressing the accelerator all the way to the floor and that the bus reached the speed of 20 miles an hour before hitting plaintiffs. There is nothing in the evidence to indicate that the bus driver took his foot off of the accelerator until he was very close to plaintiffs. There is no indication in the evidence of the maximum rate of acceleration of the bus. Simple mathematical computation will show that a bus traveling 20 miles per hour will cover the distance of 120 to 125 feet in less than five seconds. I submit that, even allowing a reasonable time for acceleration, it would be quite possible for the bus to cover the distance from the corner to the point of impact in not more than six or seven seconds, and that it would be equally possible for plaintiff Bessette, a 74-year-old man, to take six or seven seconds to walk six or seven steps across the streetcar tracks. How, may I ask, can the majority find inherent improbability in such testimony? It can do so only by blindly and arbitrarily disregarding inferences and deductions to be drawn from the evidence which has been accepted as reasonable and probable by at least seven judges and 12 jurors who have passed on the record in the Doran case.

The rule has long been settled in this state that contradictions in the testimony of a witness, even if the witness is the

plaintiff, create nothing more than a conflict in the evidence and an appellate court is required to treat such conflict the same as if it existed between two or more witnesses. Conflicting testimony of a plaintiff constitutes nothing more than a conflict in the evidence to be resolved by the trial court. (*Rice* v. *California Lutheran Hospital,* 27 Cal.2d 296 [163 P.2d 860]; *O'Banion* v. *Borba,* 32 Cal.2d 145 [195 P.2d 10]; *Bushey* v. *Union Oil Co.,* 13 Cal.App.2d 350 [56 P.2d 1272]; *Von Hasseln* v. *Von Hasseln,* 122 Cal.App.2d 7 [264 P.2d 205].) Where the jury accepts plaintiff's testimony notwithstanding its contradictions, the appellate court must do so unless it is *so inherently improbable as to be no evidence.* (*Miller* v. *Schimming,* 129 Cal.App. 171 [18 P.2d 357].) "Common experience and observation teach us that strange and astonishing things sometimes happen in the world of physical phenomena, and accidents sometimes appear to happen in manner unaccountable. For these reasons an appellate court must be careful not to give to dogmatic and undemonstrated conclusions respecting natural laws precedence over the testimony of apparently credible witnesses; and the mere fact that the admitted circumstances make the story of the witnesses seem improbable will not justify a reversal by an appellate tribunal upon the ground that the verdict is contrary to the evidence. (*Austin* v. *Newton,* 46 Cal.App. 493, 498 [189 P. 471]; see also *Postier* v. *Landau,* 121 Cal.App.2d 98 [262 P.2d 565]; *Murphy* v. *Ablow,* 123 Cal.App.2d 853 [268 P.2d 80]; *Jones* v. *Re-Mine Oil Co.,* 47 Cal.App.2d 832 [119 P.2d 219]; *Bennett* v. *Chandler,* 52 Cal.App.2d 255 [126 P.2d 173]; *Poe* v. *Lawrence,* 60 Cal.App.2d 125 [140 P.2d 136].)

### STATEMENT OF FACTS

As stated above, I do not believe that the facts are fairly stated in the majority opinion. The summary of the facts to which the majority opinion applies the law could conceivably be drawn from the submitted statements, but it is emphatically not a view of the evidence most favorable to plaintiffs. It is not even an impartial view of the evidence. It is a view of the evidence most favorable to defendant. Many different versions of the facts could be drawn from the settled statements of facts submitted by the plaintiffs. I propose that we adopt a version as favorable to the plaintiffs as the evidence will reasonably allow.

On March 17, 1950, about 7:30 p. m., plaintiffs were struck by defendant's electric overhead trolley bus as they were

crossing Union Street at a point approximately 120 to 125 feet west of its intersection with Fillmore Street, in San Francisco. Plaintiff Jules Bessette, accompanied by plaintiff Jeanne Doran, had parked his automobile on the south side of Union Street, about 110 to 120 feet west of Fillmore. Union Street is relatively narrow, being 44 feet 9 inches from curb to curb, and there were cars parked at the curbs on both sides. After leaving their car and proceeding west on the sidewalk about a car's length, plaintiffs stepped into Union Street intending to cross the street to a theater on the opposite (north) side. They walked a few steps into the street, stopped and looked both ways for traffic. They saw no moving traffic in either direction, but on their right, they saw defendant's trolley bus, stopped at the corner of Union and Fillmore Streets, on the west side of Fillmore, about 120 to 125 feet away from where they stood. The sun had gone down and it was nighttime, but the visibility was good, the street well lighted. They resumed walking straight across the street. When they reached the middle of the street, both plaintiffs again looked to the right (east) to see what the bus was doing. It was still at or near the corner, about 120 feet away, but had just begun to move. Believing that they had plenty of time to cross, they took their eyes off the bus, looked straight ahead and continued straight across the street. They did not stop at the center of the street, but looked to the right while walking.

Meanwhile, the bus driver, who had 20-20 vision and perfect peripheral vision, had started the bus by pushing the accelerator all the way to the floor. He was looking straight ahead, in the direction of plaintiffs. There were no obstructions to his view. There was no glare from the inside lights to interfere with his view. The bus headlights were on low beam, but this was adequate to see all that was necessary to be seen for operation of the bus. The lights lit up the whole street from curb to curb. He drove straight ahead until he was within 15 or 20 feet of plaintiffs, at which time he pushed on the brake pedal and turned the wheels to the left. The right front side of the bus struck plaintiffs, and the bus continued for about 8 feet after the impact before it came to a stop. The point of impact was about six or seven steps north of the center of the street, where plaintiffs last looked to see the bus at the corner. The bus driver admits that he did not sound his horn and that he did not apply his brakes when he first saw the plaintiffs, but he claims that he did not see them until he was 15 or 20 feet away from them.

### Application of Last Clear Chance Doctrine

With this statement of the facts in mind, let us proceed to a discussion of the application of the last clear chance doctrine. The last clear chance doctrine is applicable in very few cases. The case now before this court is one of those few cases. Whether or not the doctrine applies in a particular case, as correctly pointed out by the majority, depends on the existence or nonexistence of certain factual elements. The majority opinion has adequately set out the nature of those factual elements. What remains is to see whether or not those elements are present in this case.

Defendants contend that the doctrine is not applicable here because plaintiffs were aware of their dangerous position and could have saved themselves by the exercise of ordinary care. Plaintiffs may have been negligent in crossing the street in the middle of the block when there were marked crosswalks at the end of the block. But it does not follow that they were aware of any danger from the bus. They saw it stopped at the corner, walked to the middle of the narrow street, looked again and saw it still at the corner, just beginning to move. They did not look at it again, believing they had plenty of time to cross. They took six or seven more steps and were hit. Awareness of the fact that a bus 120 feet away is beginning to move does not constitute awareness of the danger which actually was present. If it did, every pedestrian who crosses a city street would be in a constant state of awareness of imminent peril, since there is usually some traffic moving toward one when he crosses a street. The evidence in this case, viewed reasonably, clearly shows that plaintiffs were totally unaware of any danger.

The majority opinion erroneously assumes that plaintiffs were "fully aware of the approach of an oncoming vehicle up to the instant before the collision. . . ." The majority seems to believe that the plaintiffs were bent on suicide. It intimates that the plaintiffs saw the bus right on top of them and blithely ignored it as they stepped into its path. No reasonable reading of the evidence could give that impression.

The case of *Palmer* v. *Tschudy*, 191 Cal. 696 [218 P. 36], which the majority opinion describes as "closely parallel on its facts," has no application to this case, because it is clearly distinguishable on its facts. I agree with the learned justices of the District Court of Appeal, who stated in their decision that the Palmer case was not applicable to this case ((Cal.

App.) 274 P.2d 464, 275 P.2d 840). They said: "*Palmer* v. *Tschudy* [citation], is not applicable here for the reason, first, that the facts are different. There the court held that the plaintiff was aware of the danger from the approaching automobile and by the exercise of ordinary care could have avoided the accident, and hence the first element above mentioned required to apply the doctrine was not present. Secondly, the court there relied on the narrow interpretation of the doctrine given in *Young* v. *Southern Pac. Co.* [citation], to the effect that one is not in a position of danger until he actually gets in the pathway of the oncoming vehicle. This interpretation, like that given in *Rodabaugh* v. *Tekus* [citation], was held in *Daniels* v. *City & County of San Francisco* [citation], not to apply where the driver is aware, as here, of the fact that the other person is coming directly into his path." There is the additional factual distinction in the Palmer case, that the plaintiff had audible warning of the approach of the automobile, the driver of which twice sounded his horn. No horn was sounded here.

Other cases which the majority opinion purportedly distinguishes (*Girdner* v. *Union Oil Co.*, 216 Cal. 197 [13 P.2d 915]; *Center* v. *Yellow Cab Co.*, 216 Cal. 205 [13 P.2d 918]; *Peterson* v. *Burkhalter*, 38 Cal.2d 107 [237 P.2d 977]) are all applicable to the extent at least that they hold that one who is totally unaware of the approaching danger may be in a position of danger from which he cannot escape by the exercise of ordinary care; that it need not be physically impossible for him to escape in order to qualify under this requirement.

It is interesting to note that the majority opinion in its summary of the "facts" near the conclusion of the opinion, states that plaintiffs were in a position of safety near the center of the street, and not in a position of danger. I had thought that this question was settled by the case of *Daniels* v. *City & County of San Francisco, supra,* 40 Cal.2d 614, 621, where the same writer held that the plaintiff was in a position of danger even though not directly in the path of the oncoming bus, but only approaching its path. No reference to the Daniels case was made in the majority discussion on this point.

On the question of whether defendant had knowledge that the plaintiffs were in a position of danger and knew or should have known that plaintiffs could not escape, the evidence clearly would support an inference that the bus driver saw

plaintiffs when he was 120 to 125 feet away from them. The bus driver himself states that he did not see them look in his direction, that they just crossed in front of him.

In light of the preceding discussion, no comment should be necessary as to the presence of the third factual element for the application of the last clear chance doctrine. By any reasonable view of the evidence, the defendant had the last clear chance to avoid the accident by the exercise of ordinary care, and he failed to exercise the same, thereby proximately causing the plaintiffs' injuries.

### The Underlying Error in the Majority Opinion

The astonishing thing about the majority opinion is that even if one accepted as a starting point the erroneous and slanted view which it takes of the facts, and even though in most (but not all) particulars it correctly states the rules of law, still it reaches a result contrary to established principles of law and logic.

In reviewing the cases on the last clear chance doctrine, the majority opinion states, ''The question of whether there is any substantial evidence, conflicting or otherwise, which could justify the application of the last clear chance doctrine in a given case, is a question of law; and in the absence of such evidence, it is error for the trial court to instruct the jury concerning that doctrine. [Citations.] On the other hand, if there is such substantial evidence, conflicting or otherwise, the question of whether the defendant should be held to have had a last clear chance to avoid the accident is a question of fact to be determined by the jury under appropriate instructions. [Citations.]''

I know of only one test for determining whether or not there is an issue of fact which should be submitted to a jury for its determination, and that is the so-called ''reasonable minds'' test. I have never heard another test suggested and I know of no other basis for determining this question. In applying this test it would seem that when a trial court has concluded that an issue of fact exists, and submits such issue to a jury, and the jury, on proper instructions, determines that issue of fact, I can see no basis whatever in reason or common sense for an appellate court to hold that no issue of fact exists.

This court has in numerous cases stated without equivocation that ''Even where the facts are undisputed, if reasonable minds might draw different conclusions upon the question

of negligence, the question is one of fact for the jury."
(*Johnson* v. *Southern Pac. Co.*, 154 Cal. 285 [97 P. 520];
*Seller* v. *Market Street Ry. Co.*, 139 Cal. 268 [72 P. 1006];
*Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 P. 651]; *Zibbell*
v. *Southern Pac. Co.*, 160 Cal. 237 [116 P. 513]; see dis-
senting opinion, *Gray* v. *Brinkerhoff*, 41 Cal.2d 180, 186,
192 [258 P.2d 834].) Can it possibly be said in the case
at bar that reasonable minds cannot draw different con-
clusions from the evidence contained in the record in this
case on the question as to whether or not the necessary
elements are present to give rise to the doctrine of last clear
chance? The answer to this question is obvious. That reason-
able minds have drawn different conclusions is demonstrated
by the record before us. The trial judge in the Doran case
gave a last clear chance instruction and the jury returned
a verdict in favor of plaintiff. The three members of the
District Court of Appeal concluded that the evidence was
sufficient to support a last clear chance instruction (Cal.
App.), 274 P.2d 464, 275 P.2d 840, and three members of
this court have arrived at the same conclusion. In view
of this state of the record, it seems clear that the case is
decided in accordance with the view of the majority because
there are four members of this court who feel it should be
so decided, and it must necessarily follow that all cases of
this character will take the same course. The reasonable
minds test which has been followed by this court and all
other common law courts since time immemorial, is without
force or effect so long as four members of this court see fit
to arbitrarily conclude that the rule is not applicable to a
case involving a particular factual situation to which they
think the doctrine should not apply.

The majority opinion in this case is an outright usurpation
of the fact finding function of the trial court in at least two
particulars: (1) It is held that the elements necessary for
application of the last clear chance doctrine were not present
*as a matter of law*; (2) it is held as a matter of law that the
defendant did not have a last chance or a clear chance to
avoid the accident. The unsoundness of the majority opinion
on these two points is clearly shown by tracing the steps in
these cases. (The cases being joined in this appeal, and the
evidence being substantially the same in each, the Doran case
is outlined as the more graphic example.) (a) Evidence was
presented on each of the two points stated above. (b) The
trial judge, in the first instance, decided that these were

questions of fact, therefore gave them to the jury for determination. (c) The jury found certain facts to be true. (It is not necessary to detail the findings—the logic is the same in any case.) (d) The trial judge granted a new trial. (e) The three able justices of the District Court of Appeal unanimously decided that reasonable minds could differ on the evidence presented, therefore reversed the order granting a new trial. (See *Doran* v. *City & County of San Francisco* (Cal.App.), 274 P.2d 464, 275 P.2d 840.) (f) On appeal to this court, a majority of the court decides that reasonable minds could *not* differ on the evidence presented, therefore affirms the order granting a new trial. As I pointed out in my concurring opinion in *Daniels* v. *City & County of San Francisco, supra,* 40 Cal.2d 614, 628, by holding that reasonable minds could not differ, the majority of this court is saying that the trial judge, the trial jury, the members of the District Court of Appeal, and their dissenting brethren on this court do not have reasonable minds. If the majority opinion says any less than this, then the problem is one of semantics. The law is clear; the logic is inescapable; the only possible reconciliation of the majority opinion and common sense must be found in divergence of opinion as to the meaning of the words used. The meaning which I attach to the words of the majority opinion shows to me that the majority opinion is illogical.

This is not the first case of this sort to come before this court. Nor is this the first time that the majority has followed this illogical course (see *Rodabaugh* v. *Tekus, supra,* 39 Cal.2d 290; *Gore* v. *Market Street Ry. Co.,* 4 Cal.2d 154 [48 P.2d 2]; *Young* v. *Southern Pac. Co.,* 182 Cal. 369 [190 P. 36]). Nor is this the first time that I have expressed my views on this subject (see *Selinsky* v. *Olsen, supra,* 38 Cal.2d 102; dissenting opinions, *Rodabaugh* v. *Tekus, supra,* 39 Cal. 2d 290; *Sparks* v. *Redinger, ante,* pp. 121, 126 [279 P.2d 971]; concurring opinion, *Daniels* v. *City & County of San Francisco, supra,* 40 Cal.2d 614; *Recent Trends in Court Decisions in California,* 5 Hast. L.J. 133). Unless we wish to repeal the portions of the Constitution of the United States and the Constitution of the State of California which guarantee the right to trial by jury, the result of this case must not be allowed to stand.

I would commend to the majority of this court a reading of the history of the development of the jury system (e. g., James B. Thayer, *The Jury and Its Development,* 5 Harv.

L.Rev. 249 (1892).) A cursory examination of that history will show that from its first establishment as a part of our system of law, the jury has had the function of determining facts. From the twelfth century to date the controlling maxim has been *"ad questionem facti non respondent judices, ad questionem legis non respondent juratores."* This may be loosely translated as "the judges do not answer questions of fact, the jurors do not answer questions of law." The trend of decisions in this court clearly shows that some of my colleagues on this bench do not feel the weight of the centuries of history which have produced this rule. Do they seek a return to the feudal system or some other pre-twelfth century form of judicial administration?

I would also recommend to the majority, a rereading and a reconsideration of the analysis of this problem which was made in my dissenting opinion in *Rodabaugh* v. *Tekus, supra,* 39 Cal.2d 290, 297, 303. The closing statement which I made there perfectly fits the situation in this case. "I do not believe it can fairly and honestly be said that the record in this case presents a factual situation on which reasonable minds cannot differ. What has happened thus far demonstrates beyond question that reasonable minds have arrived at different conclusions on the record before us. Such being the case, under the well-settled doctrine, the issue is one of fact and not of law, and hence should be determined by the trier of fact—the jury in this case.

"While the majority opinion in this case will create great confusion because it is in clear conflict with numerous other decisions of this court and the District Court of Appeal which I have cited hereinabove, of graver and more far-reaching concern is the problem that it is in direct violation of the constitutional provision that 'the right of trial by jury shall be secured to all, and remain inviolate'; (Cal. Const., art. I, § 7). It cannot be doubted that where a factual situation is presented in a case in which litigants are entitled to a jury trial as a matter of right, and the court takes the case from the jury and decides as a matter of law that there is no issue of fact to be determined, the litigants have been deprived of a jury trial, and the Constitution has been violated. Such is the situation in the case at bar. While this result may seem to be unimportant in this case, it has an insidious impact on our whole constitutional structure. If judges who have taken a solemn oath to support the Constitution can ruthlessly disregard its provisions, as the ma-

jority has done here, why demand loyalty oaths from those holding positions of lesser importance?"

As a trial lawyer I tried last clear chance cases over 30 years ago and I thought the rules applicable to these cases were quite well settled at that time, but the difficulty was then and still is in the application of these rules to a particular case under consideration. Frankly, I think the difficulty which the Supreme Court of California is now having with these cases is the result of the disposition of some members of the court to reweigh the evidence and pass upon issues of fact. I have called attention to this situation in some of my dissenting and concurring opinions, and I intend to continue to talk about this matter whenever the opportunity arises, as I feel that such a policy or practice is not only contrary to settled principles of law but is placing an undue burden upon the members of the Supreme Court. However, I am disposed to believe that so long as the personnel of the Supreme Court of California continues as it is presently constituted, this policy or practice will continue. I am hopeful, however, that the time may come when more consideration will be given to the factual determinations of the trial courts in cases of this character, as I believe that it was the intention of the framers of the Constitution to place the burden of determining issues of fact upon the trial courts and that such determinations should be accepted by appellate courts. I am unable to reconcile the reasoning of the majority in this case with this concept.

I believe in constitutional government. I believe in obeying constitutional mandates. I believe that the people of this state have the right to expect of the Justices of this court that they will obey their oath of office and support the Constitution of the United States and the Constitution of California, and I believe that when the Justices of this court decide that a party is not entitled to have a jury decide issues of fact in a case in which such party is entitled to a jury trial as a matter of right, they are not supporting the Constitution and are violating their oath of office.

If a majority of this court can deny a litigant the right to a jury trial in one case, it can do it in a hundred cases or it can do it in every case. It can thereby abrogate the right to a jury trial. That situation almost existed during one period in the history of this court in railroad crossing cases. It has almost reached that point at the present time in last clear chance cases and will contests. I am positively

and unalterably opposed to this trend in the decisions of this court.

In these two cases, I would reverse the order and the judgment respectively.

GIBSON, C. J., and TRAYNOR, J.—We dissent.

In our opinion the evidence was sufficient to justify the giving of instructions on the last clear chance doctrine.

Appellants' petition for a rehearing was denied May 25, 1955. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.