[Civ. No. 24089.   Second Dist., Div. One.   Aug. 5, 1960.]

J. J. LEONARDINI, Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation), Appellant.

*Assigned by Chairman of Judicial Council.

554

[black bars]

Robert W. Walker, Richard K. Knowlton, James D. Garibaldi and Warren J. Lane for Appellant.

Dryden, Harrington, Horgan & Swartz and Vernon G. Foster for Respondent.

FOURT, J.—This is an appeal from a judgment in favor of the plaintiff in a damage action.

A résumé of some of the facts is as follows:

A collision occurred on June 22, 1953, at about 5:42 p. m. at the intersection of defendant's main line railroad tracks and Taylor Street in Atwood (Orange County), California. Taylor Street runs north and south at the point where it crosses the defendant's right of way. The railroad tracks run generally east and west at the point with which we are concerned. There is what is denominated the main line tracks to the north side of the railroad right of way. Parallel to and about 10 feet south of the main line tracks there is a passing track at the point where the accident occurred. To the north of the railroad right of way and parallel thereto is the Placentia Yorba Road, a through highway, which is also known as State Highway Number 14. The main line tracks are substantially straight for a distance of three-quarters of a mile (3,960 feet) to the east of the crossing intersection at which point the tracks curve to the north.

One witness stated that it was about 42 feet from the south side of the state highway to the main line tracks. There is a stop sign for traffic going north on Taylor Street, at the point where Taylor Street and Highway 14 intersect. A fruit packing house is located to the east of Taylor Street and to the south of the railroad tracks. A spur track and an industrial track lead from the main railroad right of way to the packing house. A family named De Los Reyes lived in a small

house located about 50 feet south of the passing tracks and on the west side of Taylor Street. At the time of the accident David J. Vargas was driving a tractor-trailer for the plaintiff.

The trailer was a 35-foot refrigerated outfit and had been loaded with oranges at the packing house. The tractor and trailer together, as a unit, measured about 57 to 60 feet in length. After the trailer was loaded Vargas drove from the packing house onto Taylor Street and headed north towards the state highway. At the southern set of tracks (passing tracks), the driver of the tractor came to a stop and looked in each direction and saw no train approaching. He started up the tractor, looked and saw no train. There were freight cars standing on the industrial siding and on the short spur track next to the packing plant. From his position in the tractor Vargas could see the curve in the main line tracks, which curve was as heretofore indicated about three-quarters of a mile (3,960 feet) to the east of the crossing. He continued northward across the tracks. There were other vehicles ahead of him going northward on Taylor Street. He drove northward to a point where the front of the tractor was approaching the boulevard stop sign which controlled traffic on Taylor street in entering the state highway from Taylor Street. There were cars ahead of Vargas on Taylor Street which were stopped at the stop signal and waiting for an opportunity to enter the state highway. Vargas had intended to turn to the left from Taylor Street into the state highway. Traffic was heavy on the state highway and due thereto it was required that Vargas wait for the traffic which was ahead of him on Taylor Street.

There was testimony that Vargas came to a stop on one occasion when the cab of his tractor was even with the main line tracks. As the cars ahead of him moved forward he slowly moved the tractor and trailer forward. At the time of the collision there were two automobiles ahead of Vargas on Taylor Street and the semitrailer extended over the main line tracks of the railroad. Vargas knew that the trailer was so situated and remained stopped for more than a minute before the collision. He did not see the freight train coming from the east, travelling west, nor did he hear any whistle or bell. The motor of the tractor was very rough and noisy and created a great deal of vibration. Vargas first knew of the collision when he felt a jar and hear air escaping from the brake lines and looked into the rear view mirror and saw the train engine, and his cargo and debris flying through the air. After the

collision some of the train crew approached Vargas and a man who Vargas believed to be the engineer of the train stated to him that ''as he came around the corner and they seen me on the track, they knew I could never get off the track in time and they threw on their emergency, and all ran back to the back of the engine of the train.''

The foreman at the packing plant stated that the state highway was a well travelled road. He saw the tractor and trailer leaving the packing plant. Some time later he heard a train whistle coming from the north side of the packing plant, or possibly to the east of the plant but in any event it was ''real close'' and was the only whistle he heard from the train. He looked out the door and saw the tractor north of the main line tracks and the trailer extending onto the tracks and immediately thereafter he saw the train collide with the trailer splitting it in two.

The lady who lived in the small house to the south of the side tracks and on the west side of Taylor Street was in her kitchen the window of which faces the tracks. She saw the truck stopped on the tracks and heard the train continue the whistling as it cut through the trailer. The man of that house was outside of it and saw the truck come from the packing house and make a full stop at the spur track. The man then entered his house and went to a different part thereof and sometime later he heard a whistle and then the crash.

The engineer was not present in person at the trial. His version of what occurred was presented by a deposition.

He stated in effect that the train consisted of a two-unit diesel engine with 81 freight cars which were going from San Bernardino to Los Angeles. The fireman and the brakeman were with him. The engineer was not operating under any schedule and he had made the same run 18 or 20 times a month. He knew of the state highway paralleling the main line tracks but he stated that he did not see the cars ahead of the truck and did not know of the stop sign at Taylor Street and the state highway. He saw the tractor and trailer immediately after the train came around the curve, three-quarters of a mile to the east of the point of impact. The train was moving at a speed of 55 miles per hour and that speed was not diminished until the train was 300 to 400 feet to the east of Taylor Street. The engineer said the truck was moving northward when he first saw it and that it continued northward going very slowly until it stopped on the main track. He assumed that the truck would get off the railroad

right of way. He applied the emergency brakes when he saw that there was going to be a collision, which was when he was about 300 to 400 feet from the truck. It requires between 2,000 and 2,500 feet within which to stop the train in an emergency. He could not judge the speed of the train at the time of the impact.

The brakeman was riding in the cab and he first saw the truck when it was three-quarters of a mile away. He stated that the train was going about 55 miles per hour and that the truck was going northward approaching the tracks at about 2 to 3 miles per hour and continued to move onto the tracks ahead of the train and he further stated that he saw the tractor cross over the tracks and come to a stop with the trailer on the tracks and stay there for three or four seconds. He also stated that when the truck was stopped the train was about 300 feet from the crossing going at 55 miles per hour when the emergency stop was applied.

The fireman was in the cab as the train approached the crossing and he knew of the boulevard stop at Taylor Street and the state highway. He first saw the truck when it was 1,000 to 2,000 feet away at which time it was about 60 feet to the south of the main tracks moving slowly towards the tracks. He said that when the truck stopped it was only 50 feet away and the impact was within the second thereafter.

An employee of the packing house stated that he was looking out of a window of the plant which faced Taylor Street and that he saw the truck leave the plant, and then go onto the tracks and stop. He said that he saw the truck waiting for the traffic to clear on the state highway. Further, he said that when he heard the train whistle the truck was sitting on the tracks and he estimated that at that time the train was at least a quarter of a mile to the east and could have been as far as the curve in the track.

A claim adjuster of the railroad stated in effect that the speed tape of the locomotive had been destroyed even though the action in this case was filed on August 13, 1953, and an answer and counterclaim were filed on August 24, 1953. The court gave BAJI instruction numbered 205 on last clear chance.

The jury returned a verdict in favor of the plaintiff in the sum of $9,050.63 for damages to the trailer and other items. The appeal is from the judgment upon the single theory that there was no evidence to support the giving of the instruction on last clear chance.

We have concluded that there is no merit to the appellant's contention. ▆ "We must view the evidence most favorable to the contention that the doctrine is applicable . . . since plaintiff is entitled to an instruction thereon if the evidence so viewed could establish the elements of the doctrine." (*Selinsky* v. *Olsen,* 38 Cal.2d 102, 103 [237 P.2d 645]; see also *Durkee* v. *Atchison, Topeka & Santa Fe Railway Co.,* 159 Cal.App.2d 615, 620 [324 P.2d 91].)

▆ ". . . All questions of the weight of the evidence and the credibility of the witnesses are for the jury, and if there is any substantial evidence to support the verdict it cannot be set aside by the reviewing court, although such court may believe that the preponderance of the evidence was the other way. (*Jackson* v. *Burke,* 124 Cal.App.2d 519, 521 [269 P.2d 137]; *Chuck* v. *Alves,* 124 Cal.App.2d 144, 146 [268 P.2d 94].) ▆ The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion of the trier of fact. ▆ All conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged to uphold the verdict if possible. ▆ When two or more inferences reasonably can be deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]; *Jackson* v. *Burke, supra,* pp. 521-522; *Vaccarezza* v. *Sanguinetti,* 71 Cal.App.2d 687, 691 [163 P.2d 470].)" (*Tidlund* v. *Seven Up Bottling Co.,* 154 Cal.App.2d 663, 665-666 [316 P.2d 656].)

▆ In *Brandelius* v. *City & County of San Francisco,* 47 Cal.2d 729 [306 P.2d 432], the court stated the formula for a last clear chance instruction as follows at page 743:

"The formula may be restated as follows: The doctrine of last clear chance may be invoked if, and only if, the trier of the facts finds from the evidence: (1) that the plaintiff was in a position of danger and, by his own negligence, became unable to escape from such position by the use of ordinary care, either because it became physically impossible for him to escape or because he was totally unaware of the danger; (2) that defendant knew that plaintiff was in a position of danger and further knew, or in the exercise of ordinary care should have known, that plaintiff was unable to escape therefrom; and (3) that thereafter defendant had the last clear chance to avoid the accident by the exercise of ordinary care

but failed to exercise such last clear chance, and the accident occurred as a proximate result of such failure.''

▇▇▇ There is evidence in this case that the driver of the plaintiff's truck and trailer was negligent in driving it onto the railroad tracks at the time when the traffic ahead of him precluded his clearing the tracks of the trailer. Even if the defendant's version is accepted, the driver was negligent in driving the tractor-trailer onto the main line tracks of a railroad in the face of the oncoming train. The fact finder could have believed from the evidence that the driver was unable to extricate himself from the position of danger, into which he had driven, because, among other things, he was unaware of the oncoming train, as he said, and also because of his inability to force the automobiles ahead of him into the stream of traffic onto the state highway. The jury could also have found that it would have been extremely unreasonable for the driver to attempt to back the tractor and trailer off the tracks, thereby placing himself in a position of extreme danger. It would appear therefore that the jury in this case could have found that plaintiff's negligence placed him in a position of danger from which he could not escape by the exercise of ordinary care, either because of his inability to extricate himself or because he was unaware of the danger. There was testimony from which an inferenece could be drawn that the plaintiff was not, up to the moment of the impact, able to avoid the danger. The fact that the driver of the tractor and trailer might have been continuously negligent up to the time of the impact would not necessarily prevent a recovery by plaintiff. As heretofore pointed out there was evidence that he was unable to extricate himself even if he had seen the train. (*Girdner* v. *Union Oil Co.*, 216 Cal. 197 [13 P.2d 915] ; *Hardin* v. *Key System Transit Lines, Inc.*, 134 Cal.App.2d 677, 683 [286 P.2d 373] ; 21 C.L.R. 257; *Huggans* v. *Southern Pacific Co.*, 92 Cal.App.2d 599 [207 P.2d 864].)

Each member of the train crew said that he saw the truck and trailer on the tracks before the impact. Members of the train crew also said in effect, or made statements from which it was inferable that the driver of the tractor and trailer was not going to be able to get the tractor and trailer off the main line track in time to avoid the collision. The view of the train crew was clear and unobstructed for three-quarters of a mile. Some of the defendant's crew saw the truck when it was 3,960 feet away. There was nothing to hinder their

seeing the traffic upon the state highway and the vehicles on Taylor Street in front of the plaintiff's outfit which were stopped prior to entering the stream of traffic on the state highway. Some of the train crew said that the tractor and trailer was from 75 to 100 feet from the main line tracks and was going about two or three miles per hour when it was first observed. If it is assumed that the front of the tractor was 75 feet from the main line tracks when the train rounded the curve, the truck would have reached a point of danger in 16 or 17 seconds. At that time the train would have been at least 2,500 feet from the crossing—500 feet from the point where application of the emergency brakes would be effective. There was evidence that the train could be stopped in 2,000 feet. The jury could have found from the evidence that during the six seconds available to the engineer to take action between the truck's arrival on the tracks and his last opportunity to apply the brakes, he should have realized that the truck would not be able to clear the intersection, because of the traffic on the state highway, the cars ahead of the truck and the extreme length of the tractor and trailer. The jury could also have found that the brakes were not applied until some 26 seconds later. In other words, the jury could have found from either direct or circumstantial evidence that the defendant knew that the plaintiff was in a position of danger. Furthermore, there was ample evidence to the effect that plaintiff was unable to escape once having driven into the position in which the tractor and trailer was at the time of the impact. The defendant knew, or in the exercise of ordinary care, should have known that the plaintiff was unable to escape and the train crew failed to apply the brakes for a considerable time thereafter. The jury could have believed that the defendant or a reasonably prudent person would have foreseen the danger of a collision under the circumtances.

■ The questions of whether the defendant should have realized the plaintiff's danger, his inability to escape and that thereafter the defendant had a clear chance to avoid the impact are questions of fact. (*Connolly* v. *Pre-Mixed Concrete Co.,* 49 Cal.2d 483, 487 [319 P.2d 343] ; *Cawog* v. *Rothbaum,* 165 Cal.App.2d 577 [331 P.2d 1063] ; *Heffington* v. *Paul,* 152 Cal.App.2d 235, 239 [313 P.2d 157, 67 A.L.R.2d 13].)

■ Vargas testified that the tractor was across the tracks and that the outfit had been stopped for more than a minute before the collision. In point of time that would mean that Vargas had been so situated for about 12 seconds before the

train rounded the curve to the east. During the approximate 23 seconds that it took the train to go from the point of the curve (3,960 feet from the crossing) and the last available point (2,000 feet from the crossing) where the brakes could have been effectively applied, the engine crew could well have seen from all of the circumstances that the driver of the tractor and trailer could not get out of the danger he was in and the train crew did nothing to avert the accident. The brakes were applied when the train was 300 to 400 feet away which was much too late. There was ample opportunity from the time when the defendants saw that the plaintiff was in danger and from the time that it was seen that he could not extricate himself within which the defendant could have stopped the train.

It was held in *Peterson* v. *Burkhalter,* 38 Cal.2d 107 [237 P.2d 977] in effect that it could not be said as a matter of law that a defendant with two seconds within which to avoid an accident had no chance to do so. In any event there was substantial evidence upon which the jury could find that the defendant had the last clear chance under the recent decisions of the State.

The instruction was proper under the circumstances of this case.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 27, 1960.