[Civ. No. 24585.   Second Dist., Div. One.   Nov. 15, 1960.]

JAMES E. DYER, Appellant, v. LOUIS FRANCIS KNUE, Respondent.

350

Kenny, Morris & Ibanez for Appellant.

F. Carlton Myers, Conrad L. Squires and Henry F. Walker for Respondent.

FOURT, J.—This is an appeal from a judgment rendered in favor of the defendant driver against the plaintiff driver on a jury verdict in a personal injury action.

The jury returned a verdict in favor of plaintiff's passengers, Clara H. Dyer and Sybil D. Dyer against said defendant driver. Judgment was entered September 21, 1959, and on September 28th, plaintiffs, James and Clara Dyer, filed a notice of intention to move for a new trial. That motion was denied October 28, 1959. The plaintiffs appealed from the judgment on October 30th. Plaintiff, Clara Dyer, subsequently dismissed her appeal.

The sole question presented on appeal is whether the trial

court erred in refusing to instruct on the doctrine of "last clear chance."

In ascertaining whether it was error for the trial court to refuse to give appellant's instruction on the last clear chance doctrine, this court views the evidence in the light most favorable to the appellant. (*Guyton* v. *City of Los Angeles,* 174 Cal.App.2d 354, 361 [344 P.2d 910]; *Bonebrake* v. *McCormick,* 35 Cal.2d 16, 19 [215 P.2d 728].) There must be *substantial evidence* present to justify the question of last clear chance going to a jury, and the existence of substantial evidence justifying the application of the doctrine is a question of law. (*Doran* v. *City & County of San Francisco,* 44 Cal.2d 477 [283 P.2d 1]; *Nippold* v. *Romero,* 145 Cal.App.2d 235 [302 P.2d 367].) In *Estate of Teed,* 112 Cal.App.2d 638, 644 [247 P.2d 54] the court said with reference to substantial evidence as follows:

"Webster's International Dictionary defines the word as follows: 'Consisting of, pertaining to, of the nature of or being, substance, existing as a substance; material.' Its meaning is further defined as 'not seeming or imaginary, not illusive, real, true; important, essential, material, having good substance; strong, stout, solid, firm.' The word means 'considerable in amount, value or the like; firmly established, solidly based.' Synonyms are 'tangible, bodily, corporeal, actual, sturdy, stable.'

" 'Substantial evidence,' according to Words and Phrases, Fifth Series, page 564, . . . is evidence 'which, if true, has probative force on the issues.' It is more than 'a mere scintilla,' and the term means 'such relevant evidence as a reasonable man might accept as adequate to support a conclusion.' . . . *'improbable conclusions* drawn in favor of a party litigant through the sanction of a jury's verdict *will not be sustained where testimony is at variance with physical facts and repugnance is material and self-evident.'* (Emphasis added.)

"The sum total of the above definitions is that, if the word 'substantial' means anything at all, it clearly implies that *such evidence must be of ponderable legal significance.* Obviously the word cannot be deemed synonymous with 'any' evidence. *It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case."* (Emphasis added.)

The accident, which is the subject of this appeal, occurred

on U. S. Highway 99, at a point where the highway passes the El Rancho Café and Garage. In this area the highway runs generally north and south. It is a four-lane highway, separated for north and southbound traffic by a divider. Directly opposite, or to the west of the El Rancho Café and Garage, the divider is broken by a cross-over, approximately 50 feet in length. At this point the slightly raised divider is approximately 27 feet wide. The collision occurred in the northbound lanes of traffic in or near the cross-over. At this point there are two lanes for northbound traffic, each of which is approximately 12 feet wide and there is a 6 to 8-foot shoulder, asphalt in nature.

At the time of the collision, appellant's car was headed in a generally westerly direction crossing Highway 99 and respondent's car was headed in a northerly direction on the highway.

According to appellant's testimony, after leaving a restaurant and filling station area, he drove in a westerly direction and stopped 2 or 3 feet from the edge of the travelled portion of the highway. Thus stopped, nothing obstructed his view of the highway to the north or to the south.

The highway to the south of the El Rancho Café curves to the left, or east. When appellant's car was stopped, he could see approximately 800 feet to the south and he did not observe any cars approaching from the south going north.

Appellant further testified that after waiting for several southbound cars to pass, and then again looking south and seeing no approaching traffic, he started across the highway and ". . . the next thing I knew, why, I felt this jolt."

When the collision occurred the front wheels of appellant's car were in the gravel cross-over part of the divider. He stated that from the time his automobile left the position approximately 2 to 3 feet east of the travelled portion of the highway, until the point of impact *it did not stop* and the maximum speed attained was 10 miles per hour. Appellant also stated that he did not remember whether his passengers ever said anything to him about a car approaching from the south (i.e., travelling northbound) or whether they urged him to hurry up. One of appellant's witnesses, Officer Botsford, testified that appellant's statement to him was: " 'I made stop coming out of station. Saw no one coming. Asked my wife if it was O.K. to go. She said, "Hurry." Started to cross when Vehicle No. 1 (defendant's vehicle) hit us in left side.' "

Officer Botsford read into the record a statement of the respondent as follows: "My notes here indicate driver No. 1's statement: 'I was northbound on 99 in lane No. 2 (i.e., lane next to shoulder—lane No. 1 would refer to lane next to divider), travelling at approximately 65 to 70. Vehicle No. 2 (i.e., appellant's automobile), pulled out of station into lane No. 2 and *stopped*. I sounded my horn and changed lanes to No. 1 northbound and started to go in front of him. No. 2 then started to move across highway in front of me. I applied my brakes but it was too late and I hit him.'" (Emphasis added.) When the officer arrived at the scene of the accident, he found appellant's automobile had sustained major damage to the left side and found respondent's car totally damaged in front. In investigating the accident, he measured 114 feet of two-wheel skid marks (including 75 feet of four-wheel skid marks) from respondent's vehicle prior to its jumping the north edge of the divider. The witness further testified that he measured the distance between the point of impact and respondent's vehicle and found it to be 42 feet. From his investigation of all of the evidence at the scene of the accident, he formed an opinion that at the time the respondent applied his brakes, he was travelling at approximately 58 miles per hour.

The next witness called on behalf of appellant was John Harris, an automobile mechanic employed by the El Rancho Garage. The witness observed the collision between the cars driven by appellant and respondent. He stated that as the respondent's car came around the curve (approximately 700 to 800 feet south of the point of impact) he, the witness, had an opinion that the car was travelling somewhere between 80 and 100 miles per hour. According to Harris' testimony, at the time he *first saw* the respondent's northbound car, appellant's car was approximately in the *middle* of the northbound highway and was *moving* at the rate of "seven, eight, ten miles an hour." The witness kept respondent's vehicle under observation until he saw it collide with appellant—". . . I watched it to see if he was going in front of it or behind it." The witness heard respondent's car horn blowing a few seconds after it came around the corner and heard the squeal of brakes. At the point of impact he estimated respondent's speed to be approximately 60 miles per hour. On cross-examination Harris testified that before the accident he had an unobstructed view to the south; that he observed appellant's car pull up to the intersection and stop, at which time

he had not seen respondent's car coming. He then observed appellant's vehicle start up and keep on moving to the point of impact. On redirect examination he testified that there had been a split second when he could not observe both vehicles and that the appellant's car was moving at the time he first saw the respondent's car; that neither appellant's nor respondent's vehicle stopped until the collision.

Respondent testified that when he first observed appellant's car, the front end of his car was approximately in the center of northbound lane 2 and was stopped. At that time respondent was travelling in northbound lane 2, in the neighborhood of 50 to 55 miles per hour. Immediately upon seeing appellant's car, respondent removed his foot from the accelerator, changed lanes, applied the brakes gradually and sounded his horn. He sounded the horn from the time he changed lanes until the time he hit appellant's car. Respondent further testified that by the time all four wheels of his automobile were in northbound lane 1, appellant's car had not changed position. *After* respondent's car was in northbound lane 1, appellant's car moved forward in a westerly direction (i.e., crossing the northbound lane). At that instant respondent had no definite recollection of what the speed of his car was, but that he had not applied any more gas. When he observed appellant's car move forward toward the center strip, he applied his brakes with more force. After the accident, respondent observed skid marks and agreed with Officer Botsford's testimony regarding the measurements.

Respondent's car struck appellant's car approximately at the left front fender. Just before the impact, respondent recalled that his left front wheels scraped or even may have climbed up on the curbing of the divider before entering the cross-over section.

Based upon respondent's recollection of the relative position of the two cars, when he first observed appellant's car, he stated that the distance between the two cars at that time was about 175 feet. Subsequently, he revised his estimate to 175 yards (225 paces). On cross-examination he testified that it took him two or three seconds to remove his foot from the accelerator pedal and on to the brake pedal. The reporter's transcript discloses the following:

"Q. A matter of two or three seconds? A. Yes. I mean, I wasn't in any particular big hurry to apply the brake.

"Q. You saw a car stopped there, I think you told us, in

the lane ahead of you down the highway? A. Yes, but I was a way, way back there.''

He then testified that when he first applied the brakes he did not use full force, that his car was gradually slowing down; that the car was under the braking effect the entire time until he applied full force and the car started to skid; that he was applying the brakes when he changed lanes.

Mrs. Betty Knue, a witness, called by the respondent largely corroborated the testimony given by her husband. She testified that she was a passenger in respondent's car in the right front seat; when she first observed appellant's car it was stopped in the outside lane (i.e., lane toward the shoulder), about halfway to the line that separates lane 1 from lane 2. At this time, respondent's automobile had about finished the curve to the south of the place where the accident occurred. Prior to the collision she was thrown to the floor of the car. On cross-examination, she testified that the last time she saw appellant's car it had started with a jerk from a standing position and started off into the lane in front of respondent's car. She did not recall the squealing of any brakes, but did hear the horn.

The evidence pertaining to the speed of respondent's car is conflicting. Appellant, who testified that he never saw respondent's car, gave no estimate of its speed. Respondent testified that at the time he first saw appellant's car he was travelling ''in the neighborhood of 50, 55 miles an hour.'' Officer Botsford testified that defendant's statement to him was that he was travelling ''at approximately 65 to 70.'' Officer Botsford's opinion was that defendant's vehicle, at the time of applying the brakes, was going approximately 58 miles per hour. Harris testified that respondent came around the curve at between 80 and 100 miles per hour and estimated that at the time of the collision the defendant was going around 60 miles per hour.

The last clear chance doctrine which relieves a party of the results of his own contributory negligence and permits him to recover despite his own negligence is applicable only in the exceptional case wherein there is substantial evidence to support a finding on *each* of the three elements. (*Doran* v. *City & County of San Francisco, supra,* 44 Cal.2d 477, 486 [283 P.2d 1].) These three elements, in the language of *Brandelius* v. *City & County of San Francisco,* 47 Cal.2d 729, 743 [306 P.2d 432], were reiterated by the Supreme Court in the recent case of *Hildebrand* v. *Los Angeles Junc-*

*tion Ry. Co.,* 53 Cal.2d 826, wherein the court stated at page 830 [3 Cal.Rptr. 313, 350 P.2d 65] :

''The court refused to instruct the jury on the doctrine of last clear chance. This rule can be invoked only where the evidence is such that the trier of fact can properly find '(1) *that the plaintiff was in a position of danger and, by his own negligence, became unable to escape from such position by the use of ordinary care,* either because it became physically impossible for him to escape or *because he was totally unaware of the danger;* (2) *that defendant knew that plaintiff was in a position of danger and further knew,* or in the exercise of ordinary care *should have known, that plaintiff was unable to escape therefrom;* and (3) that *thereafter defendant had the last clear chance to avoid the accident by the exercise of ordinary care but failed to exercise such last clear chance, and the accident occurred as a proximate result of such failure.'* (*Brandelius* v. *City & County of San Francisco,* 47 Cal.2d 729, 743 [306 P.2d 432].)'' (Emphasis added.) (Also see *Leonardini* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 183 Cal. App.2d 552 [6 Cal.Rptr. 798].

In applying the facts of this case to the requisite cited elements, the first element is satisfied. According to appellant's testimony, after looking to the south and seeing no cars approaching, he drove his car without stopping onto the travelled portion of the highway to the point of the collision. He neither saw nor heard respondent's car before the collision. Therefore, there is substantial evidence ''that the plaintiff was in a position of danger and, by his own negligence, became unable to escape from such position by the use of ordinary care, . . . because he was totally unaware of the danger.''

The second requisite element of the doctrine is divided into two parts. First, that ''defendant knew that plaintiff was in a position of danger,'' and second, that he ''knew or . . . should have known, that plaintiff was unable to escape therefrom.'' The only testimony as to when defendant actually became aware of plaintiff's existence was that given by defendant and his wife. Defendant testified that he was about 175 yards (i.e., 525 feet) away from appellant when he first observed him. Defendant's wife testified that she first observed appellant's car when defendant's car ''had finished or about finished making the curve.'' Thus, the only evidence as to the *distance* between the two cars when appellant's car was first observed by defendant would be between 525 to 600

feet. Although there is no conflict over the fact that appellant's vehicle was stopped, there is a conflict as to *where* and *when* it was stopped. Defendant and his wife testified that when appellant's vehicle was *first seen, it was stopped.* Appellant testified that he stopped some 2 or 3 feet from the edge of the travelled portion of the highway. This was corroborated by the witness Harris. Defendant testified that appellant was stopped near the center of northbound lane 2.

If appellant's version of *where* he was stopped is accepted, it would be indeed difficult to draw the inference that defendant, when he first observed appellant, ''knew that plaintiff was in a position of danger,'' since appellant would not have even been upon the travelled portion of the highway when first observed. Since the evidence is viewed in a light most favorable to appellant, respondent's version of *where* appellant was positioned will be accepted. Since respondent's testimony placed appellant in the center of lane 2 (i.e., across the lane of northbound traffic), the jury could infer that respondent ''knew plaintiff was in a position of danger'' or at least, was in a position of potential danger.

According to appellant's testimony, from the time his automobile left the spot approximately 2 to 3 feet east of the travelled portion of the highway until the point of impact *it did not stop* and the maximum speed attained was 10 miles per hour. Appellant's witness, Harris, corroborated the fact that appellant's vehicle did not stop once it entered the travelled portion of the highway and he testified that appellant's car was approximately in the *middle* of the northbound highway and moving when he first observed respondent's car coming around the curve, some 700 to 800 feet south of the point of impact, respondent's car travelling somewhere between 80 to 100 miles per hour. He estimated that appellant's vehicle was travelling ''somewhere around seven, eight, ten miles an hour.'' The difficulty with Harris' testimony is that the mathematical ramifications of what he testified to render his version something less than credible.

If, according to Harris' testimony, appellant's vehicle was in the middle of the northbound lane, and moving, then appellant would have had some 18 feet[1] to travel before he would have reached the point of impact. If appellant's vehicle was moving at 7 miles per hour, it would cover the 18 feet in

---

[1]Each lane being 12 feet wide and appellant's car being in the middle of lane 2, leaving one half of lane 2 (6 feet) and all of lane 1 (12 feet).

approximately 1.75 seconds; at 8 miles per hour, it would take approximately 1.5 seconds, and at 10 miles per hour, it would take approximately 1.2 seconds. According to Harris, while appellant's vehicle was positioned and moving as above indicated, respondent's vehicle was coming around the curve some 700 to 800 feet away, travelling between 80 and 100 miles per hour. Even assuming (which is contrary to the record) that respondent maintained the same constant rate of high speed right up to the point of impact, under this witness' testimony, the accident could not have occurred. If respondent had been travelling at 100 miles per hour, it would have taken approximately 5.4 seconds to cover 800 feet and 4.7 seconds to cover 700 feet; at 90 miles per hour, approximately 6 seconds for 800 feet and 5.3 seconds for 700 feet; and at 80 miles per hour, approximately 6.8 seconds for 800 feet and 5.9 seconds for 700 feet. Based upon the time-distance interval, the more slowly respondent was driving, the more incredible Harris' testimony becomes.

Appellant's vehicle was either moving or standing still at the time when respondent's vehicle came into view. ▮▮▮ As stated by Mr. Justice Peters in *Hicks* v. *Reis*, 21 Cal.2d 654, 660 [134 P.2d 788]:

". . . [T]he trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. *The trier of the facts may not believe impossibilities.*" (Emphasis added.)

▮▮▮ The evidence is without dispute that when respondent first observed appellant's vehicle, some 525 feet away, the latter vehicle was not in lane 1. The only open space under any possible view of the evidence available to respondent's car was lane 1. The evidence shows without contradiction that upon observing appellant's car, respondent sounded his horn, removed his foot from the accelerator and placed it on the brake, gradually slowing as he changed from lane 2 to lane 1. The evidence discloses that it took respondent some 2 to 3 seconds to remove his foot from the accelerator pedal and on to the brake pedal, the respondent testifying, "Yes. I mean, I wasn't in any particular big hurry to apply the brake. . . . I was a way, way back there." In the 2 to 3-second interval prior to the time respondent applied his brakes (assuming that he was travelling somewhere in the vicinity of 60 miles per hour), respondent's vehicle covered between 175 and 263 feet. He testified that when he finally did apply

his brakes, he did not apply them full force, that ''The car was under a gradual braking the entire time until I had to apply full force on the car.'' He further testified that he was approximately 75 feet from the point of impact when his car started to skid.

Clearly, once respondent's vehicle entered into lane 1 (the unobstructed lane) and appellant's vehicle remained *stopped* either in the middle of lane 2 or 2 or 3 feet from the travelled portion of the highway, it would be most difficult to find justification for an inference that respondent ''knew . . . or should have known, that plaintiff was unable to escape (from a position of danger).'' It would only be after appellant began to proceed into lane 1 that this inference could be warranted.

The fact that a defendant actually observes a plaintiff some considerable time before the accident does not necessarily make the doctrine applicable. (*Kowalski* v. *Shell Chemical Corp.*, 177 Cal.App.2d 528, 536 [2 Cal.Rptr. 319]; *Dalley* v. *Williams*, 73 Cal.App.2d 427, 435-436 [166 P.2d 595].)

While it is true that the trier of fact would not be required to believe testimony given by respondent, it is equally true that ''. . . disbelief does not create affirmative evidence to the contrary of that which is discarded.'' (*Lubin* v. *Lubin*, 144 Cal.App.2d 781, 795 [302 P.2d 49].) A legal inference can only flow from a fact actually established and not from the nonexistence of a fact. (*Strnod* v. *Abadie*, 181 Cal.App.2d 737, 740 [5 Cal.Rptr. 627].)

An examination of the record as a whole fails to disclose that there is substantial evidence to support a finding on each of the three necessary elements. While parties to a law suit are entitled to have the jury fairly and impartially instructed and to have them instructed upon their theory of the case (*Sills* v. *Los Angeles Transit Lines*, 40 Cal. 2d 630 [255 P.2d 795]), this is subject to the requirement that there be substantial evidence in the record which would support the particular theory.

For the reasons stated, the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.