**CHURCHILL**

v.

**SOUTHERN PAC. CO.**

No. 13368.

United States Court of Appeals,
Ninth Circuit.

Aug. 9, 1954.

Rehearing Denied Oct. 14, 1954.

Morgan & Beauzay, Robert Morgan, Johnson, Morgan, Thorne, Speed & Bamford, San Jose, Cal., for appellant.

Dunne, Dunne & Phelps, R. Mitchell S. Boyd, A. B. Dunne, San Francisco, Cal., for appellee.

Before ORR and POPE, Circuit Judges, and CARTER, District Judge.

JAMES M. CARTER, District Judge,

The action is one based on negligence, and arises under the diversity of citizenship jurisdiction of the district court. After plaintiff's case was presented to a jury, the court granted the motion of the defendant to dismiss under Rule 41 (b), Rules of Civil Procedure, 28 U.S.C. A., took the case from the jury and made its written order of dismissal. The correctness of such action by the trial court is the sole question presented on this appeal.

■ Whether or not a certain set of facts constitute a cause of action based on negligence, in a case arising under the diversity of citizenship jurisdiction of the federal court, must be determined by application of state law. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

■ Under California law plaintiff's evidence must be viewed in its most favorable light and the plaintiff must be given the benefit of all favorable inferences a jury would be entitled to draw from the evidence.

"* * * The granting of a motion for nonsuit is warranted '* * when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' * * *.". Raber v. Tumin, 1951, 36 Cal.2d 654, at page 656, 226 P.2d 574, at page 575. Sunset Milling & Grain Co. v. Anderson, 1952, 39 Cal. 2d 773, 779, 249 P.2d 24.

The plaintiff and appellant, hereafter referred to as Churchill, was employed by Barron-Gray & Dole Pineapple Company at San Jose, California, hereafter referred to as the Company. The premises of the Company consisted in part of a main building and a warehouse. Running between these buildings, in a general northerly and southern direction were three sets of railroad tracks. The floor levels of both the main building and warehouse were at the levels of the floor of freight cars which loaded from the warehouse.

Two of the three sets of tracks ran the entire distance between the main plant and the warehouse. The third set of tracks, coming from the south, dead ended at a crossing or ramp, which started at the floor level of the warehouse, dropped down as a ramp or incline, crossed the two sets of tracks and ran as a ramp or incline up to the floor level of the main building.

This crossing was of concrete. Employees of the Company used it to walk from one building to the other, and across it also operated fork lifts. These were small motorized units having a blade or fork protruding to the front. The employee rode on and operated the unit. The blade or fork was slipped under a pile of cases containing canned goods, which were then lifted from the floor, transported some distance and then set down again.

The complaint alleged the defendant and appellee, Southern Pacific Company, hereafter called the Railroad, owned the three sets of tracks and the right of way between the main plant and the warehouse of the company and that said tracks intersected with a certain crossing used by employees "of the Company during the regular course of business conducted by such Company." These allegations are not denied by the answer, which alleges also that "a certain set of two railroad tracks and right of way, running on the premises of Barron-Gray & Dole Pineapple Company, intersected with a certain crossing used by said Company and its employees."

From these artless allegations and admissions, we draw the following: 1. The main plant and the warehouse were owned by the Company; 2. The Railroad owned a right of way and the tracks thereon, running between the two buildings. There were no allegations in the pleadings and no evidence as to

who owned or controlled the crossing or how it came into being. Since it ran across the right of way owned by the Railroad from the one building to another, we conclude it was owned by the Railroad.

Goods were packed in the main plant, moved across the tracks for storage in the warehouse and then loaded from the warehouse at car level into freight cars spotted on the third track which came from the south and dead-ended at the crossing. Thus, we conclude that the tracks and crossing were maintained by the Railroad for the joint benefit of the Company and the Railroad.

At the time of the accident two freight cars had been spotted on the third and dead-end track, next to and immediately south of the crossing. They had been spotted by the Railroad at the Company's request, for loading purposes. Churchill and the operating crew of the Railroad knew they were in such position and knew they blocked the view of one crossing from the west.

The Railroad maintained no signs, signals or warnings at the crossing. The Company maintained three devices: (1) A sign at the archway or doorway in each building on either side of the crossing marked, "Railroad crossing." (2) A light with red lens and the word "stop" across it, on each side of the crossing, (hooded in some manner from view of the trainmen) which operated electrically on manual operation, i. e. buttons on the rail either side of the crossing would start the current and the light would blink off and on until manually stopped. (3) A mirror the size of a twenty inch TV screen had been set up in the main building side, visible to one crossing from the west, which when one was about 50 feet from the mirror, revealed the length of the first freight car and about twelve inches of the second freight car spotted on the dead-end track.

Occasionally in the peak of the packing season, the Company used a flagman who operated the manual electric sign and also used a portable sign. No such flagman was on duty on the day of the accident.

Churchill had worked for the Company for four years as a fork lift operator. There were approximately ten fork lift operators working on the day the accident occurred. Each of the fork lift operators would make between thirty and thirty-five trips a day across the tracks.

On the date in question, Churchill was travelling from the westerly side of the tracks to the easterly side of the tracks over the crossing. He had just previously crossed the tracks to the warehouse located on the westerly side. The switch engine was not present then but had been at 8:30 or 9:00 a. m. that morning.

Churchill testified that as he approached the crossing the blinking lights were not on and the word "stop" thereon was not illuminated; that he did not hear any bell in the locomotive nor any whistle at any time prior to or subsequent to the accident; that he looked in the mirror located opposite because the box cars blocked his vision. By use of the mirror he saw nothing except the first box car and about a foot of the second box car; that he slowed his fork lift to a speed of two to three miles per hour at the bottom of the ramp; that he could not see down the tracks by direct vision until his fork lift was so located as to place the prongs of the fork lift on the railroad track; that as he got into a position where he could see around the box car, he saw the locomotive approximately ten feet away; that if he stopped at that time he would have been hit in the middle; he therefore stepped on the gas and attempted to clear the crossing.

Altmeyer, the engineer, and employee of the Railroad called as plaintiff's witness,[1] testified that he had been em-

1. Altmeyer was called "as an employee of the Southern Pacific Company," the defendant. Rule 43(b), Rules of Civil Procedure, provides in part, " * * * A

ployed for three years on this particular run; that the box cars spotted south of the ramp obscured his view of the crossing; that there had been a previous near accident at the same place involving another employee who had run the forks of the fork lift beneath the wheels of his diesel; that he was seated on the right of the locomotive, on the westerly side nearest the warehouse and was watching ahead towards the crossing. That he was travelling approximately four miles per hour and that three other employees of the Railroad were on the engine step, which is ordinarily at the rear of the engine, but since the engine was backing, was on the leading portion of the engine. That the engine was pulling one empty box car. That he never saw Churchill before the accident occurred, though he was watching the crossing; that he knew the area was a dangerous one, and when the three men shouted he applied the emergency brakes and then reached for the sand without looking, because he knew there was another fork lift operator in the way. That he did not blow a whistle but the bell was ringing. The train stopped with the foot board one foot north, and beyond the crossing. The crossing was seven to eight feet wide.

Churchill said the train was ten feet away when he first saw it; that he continued to watch the engine but that it did not seem there was any change in the speed of the train while he was watching.[2] The train hit the back end of his bug and tipped it over.

■ It would serve no useful purpose to discuss at length the question of negligence and contributory negligence for the reason that we are of the opinion that the case comes within the rule of the doctrine of the last clear chance, and that by the application of the doctrine, a question of fact was presented which should have been resolved by the jury. We therefore do not discuss other theories which might or might not have established negligence;—

(1) whether the Company permitted the warning "stop" lights to be maintained at or near their right of way, but which apparently were so hooded that a train crew could not ascertain whether or not they were operating, or,

(2) whether there was negligence, when the engineer, approaching a known blind spot because of the spotted cars, did not blow the whistle, and if the jury believed Churchill's testimony, did not ring the bell;

(3) whether under the pleadings, the crossing was owned by the Railroad and the Company's employees were business invitees;

(4) whether spotting the freight cars so they blocked the view of persons crossing the ramp from west to east required additional precautions on the part of the Railroad. We pass no opinion on whether or not negligence may be spelled out in these situations.

Nor need we discuss whether or not there was contributory negligence as a matter of law; or whether the exercise of some care by Churchill excused him from stopping the fork lift and alighting and ascertaining if the way was clear, and we express no opinion on this matter.

■■ Nor do we pass on the question of positive versus negative evidence[3] as presenting a question to the

party may call an *adverse party* or an *officer, director*, or *managing agent* of a public or *private corporation* * * * in all respects as if he had been called by the adverse party * * *." [Emphasis supplied.]

2. The full testimony of Churchill is as follows:
"Q: Did you observe whether or not this train—did you observe that train as you proceeded across? After you stepped on the gas, did you continue to watch it?
"A: Yes, sir.
"Q: Did you observe it slow its speed, or increase its speed? Was there any change in its speed while you were watching?
"A: Didn't seem like to me."

3. The Federal cases cited by the appellee Railroad rest on State law applicable to the particular case. Gulf, M. & O. R. Co. v. Freund, 8 Cir., 1950, 183 F.2d

jury—except as we hereafter reiterate the California rule that the credibility of a witness is for the jury and they are entitled to disbelieve the bald statement of a witness.

The question of the applicability of the law of the doctrine of the last clear chance was not raised in the trial court by pleadings or argument or suggestion of counsel. While on appeal, this court raised the question and gave counsel an opportunity to supplement their briefs on this question. Obviously the learned trial judge did not have the benefit of this research.

■ Under California law the doctrine of the last clear chance is available to a plaintiff in a proper case without specific pleading. Langford v. San Diego Electric Railway Co., 1917, 174 Cal. 729, 164 P. 398.

■■ The doctrine of the last clear chance is an established rule in California. The rule as stated in Girdner v. Union Oil Co., 1932, 216 Cal. 197, 202, 13 P.2d 915, 917, contains three elements: (1) "That the plaintiff has been *negligent* and, as a result thereof, is in a position of danger from which he cannot escape by the exercise of ordinary care; and this includes not only where it is physically impossible for him to escape, but also in cases where he is totally unaware of his danger and for that reason unable to escape;" (2) "that defendant has knowledge that the plaintiff is in such a situation, and knows, or in the exercise of ordinary care should know, that plaintiff cannot escape from such situation," and (3) "has the last clear chance to avoid the accident by exercising ordinary care, and fails to exercise the same, and the accident results thereby, and plaintiff is injured as the proximate result of such failure." Dan-

iels v. City and County of San Francisco, 1953, 40 Cal.2d 614, 255 P.2d 785; Sills v. Los Angeles Transit Lines, 1953, 40 Cal.2d 630, 255 P.2d 795.

> "The credibility of a witness and the weight to be accorded his testimony are questions directed to the trier of fact who may accept *all* or *part* of the testimony of any witness it believes to be true or may reject *all* or *any part* of which it believes to be untrue." [emphasis supplied]

In re Estate of Durham, 108 Cal.App.2d 154, 155, 238 P.2d 1061; Hansen v. Bear Film Co., Inc., 28 Cal.2d 154, 184, 168 P.2d 946; Sills v. Los Angeles Transit Lines, supra, 40 Cal.2d at page 638, 255 P.2d at page 800.

There was evidence from which the jury might have concluded that Churchill was contributorily negligent and was in a position of danger from which he could not escape by the exercise of ordinary care. We thus have the first element of the doctrine.

As to the second element, Altmeyer, the engineer, knew of other near accidents at the same crossing, including one case when the fork lift operator got his forks under the diesel, but the engine was stopped in time. Altmeyer's testimony establishes that upon immediate warning by his crew he knew that "it was either somebody coming down the ramp, either one of the lift trucks or on foot."

Thus Altmeyer, acting for the Railroad, knew the person on the crossing was in a position of peril. Although Altmeyer testified he was looking in the direction of the crossing and did not see Churchill at any time prior to the accident, the jury was entitled to disbelieve him and find that he actually saw

---

1005, 21 A.L.R.2d 729, rests on Illinois law. So does Bocock v. Wabash R. Co., 7 Cir., 1949, 171 F.2d 834. Union Pacific R. Co. v. Gaede, 10 Cir., 1940, 110 F.2d 931, rests on Colorado law. Spreitler v. Louisville & N. R. Co., 7 Cir., 1941, 125 F.2d 115, relies on various state cases, none from California. The two

California cases relied on by the appellee Dull v. Atchison, T. & S. F. Ry. Co., 1938, 27 Cal.App.2d 473, 81 P.2d 158, and Hughes v. Atchison, etc., Ry. Co., 1932, 121 Cal.App. 271, 8 P.2d 853, have never been cited by the Supreme Court of California for the points appellee thinks it finds in them.

Churchill. Wahlgren v. Market Street Railway Company, 1901, 132 Cal. 656, 665, 62 P. 308, 64 P. 993; Darling v. Pacific Electric Railway Company, 1925, 197 Cal. 702, 242 P. 703; Hoy v. Tornich, 1926, 199 Cal. 545, 250 P. 565; Haerdter v. Johnson, 1949, 92 Cal. App.2d 547, 551, 207 P.2d 855. And finally, the jury was entitled to draw the inference that Altmeyer was aware of the fact that Churchill could not escape from this peril by the exercise of ordinary care.

We now consider the last element of the doctrine, did the Railroad have a last clear chance to avoid the accident by the use of ordinary care?

There was no evidence on how many seconds or feet would have been required to stop the engine. The engine weighed 231,000 or 232,000 pounds. It was travelling only four miles an hour. The air brakes were connected on both the engine and the empty box car. The braking services of the wheels of the engine and the box car were thus available. Churchill testified it did not appear that the engine decreased its speed after he first saw it. Altmeyer, the engineer, testified he reached for the sand. The jury could infer that the sand was used to lay on the track, and thus make the brakes more effective. There was no testimony that he actually turned on the sand, unless we read the word "fan" in the record as "sand."[4] In any event if it could be said that Altmeyer testified he put on the sand, the jury was entitled to disbelieve him. Altmeyer also testified that he immediately put on the brakes, but the jury was not required to believe him in this respect.

In Sills v. Los Angeles Transit Lines, supra, the court stated at page 638 of 40 Cal.2d, at page 800 of 255 P.2d:

"Thus, while the motorman testified that he immediately applied his brakes when he saw the automobile on the track ahead, the jury might have disbelieved him and accepted plaintiff's statement that there was no decrease in the speed of the approaching streetcar at any time prior to the impact."

Thus, while the engineer testified that he immediately applied his brakes when he knew of the nature of the danger to someone on the track ahead, the jury might have disbelieved him and believed the plaintiff's statement that there was no decrease in the speed of the approaching engine at any time prior to the impact.

The inferences reasonably to be drawn from these facts are: (1) that upon knowledge by the Railroad of Churchill's peril, immediate action should have been taken; (2) that the knowledge of peril was known to the Railroad from the time the engineer was ten feet distant from Churchill as he entered the crossing until the time of collision; (3) that the engine travelled from thirteen to seventeen feet before coming to a halt;[5]

4. The full testimony as to sand is as follows:

Testimony of Altmeyer:

"A: No, I couldn't see him, but the men, the minute the men hollered I knew there was something going on and I reached right around and applied the emergency brakes, then wheeled around and turned on the fan.

"Q: . . . Where are the controls, to your back?

"A: The controls are right here (indicating) just in front of me.

"Q: Your controls——

"A: That is, they would be at the side of me when I am looking this way, because the control is right in the middle of my seat, and it is a swivel seat and when they hollered, I just swirled around and grabbed the emergency brakes, shoved it on and then reached for the sand. The sand is right by the bell.

"Q: And you immediately swivelled and put on the sand?

"The Court: No, he said he swivelled and put on the brake and then put on the sand.

"Q: By Morgan: Put on the brake and then the sand. You weren't out of your seat?

"A: No, sir."

5. The distance can only be approximated. The ramp was seven or eight feet wide. Churchill was ten feet from the engine when he saw it. The front of the engine

(4) that since the engine came to a stop with the foremost portion (the foot board) about one foot over the north edge of the crossing, and since the engine hit the rear end of the fork lift, a matter of seconds or a few feet in slowing or stopping the engine would have prevented the accident from occurring; Darling v. Pacific Electric Railway Company, supra, 197 Cal. at page 711, 242 P. at page 707; (5) that the engineer did not apply sand to the tracks while the brakes were applied; (6) that the engineer did not immediately put on the brakes after becoming aware of the danger; (7) that had these things or either of them been done, the engine could have stopped in time to avoid the accident; (8) that the failure of the Railroad's agent to take such immediate action was not excused nor explained by any evidence and therefore such omission constituted a supervening cause over the negligence of Churchill, and thus constituted the proximate cause of Churchill's injury.

Since the third element of the doctrine was reasonably raised by the plaintiff's evidence, this element became a question of fact for the jury. "Whether or not the doctrine of last clear chance applies in a particular case depends entirely on existence or non-existence of the elements necessary to bring it into play. Such question is controlled by factual circumstances and must ordinarily be resolved by the fact-finder." Daniels v. City and County of San Francisco, supra [40 Cal.2d 614, 255 P.2d 788].

Accordingly, we hold the trial court was in error in granting the motion under Rule 41(b) Rules of Civil Procedure and thus taking the case from the jury.

---

came to a stop one foot beyond the north side of the crossing.

If Churchill was travelling close to the right hand side of the crossing, he would have been about two feet from the edge. Thus the engine travelled ten feet plus the six remaining feet of the crossing

The judgment of dismissal must be reversed and the case remanded to the trial court for further proceedings not inconsistent with this decision. Judgment

Reversed and remanded.

---

plus one foot, a total of seventeen feet. If Churchill was two feet from his left or wrong side of the crossing, the engine travelled ten feet plus two feet of the crossing, plus one foot, a total of thirteen feet.