**UNION PACIFIC RAILROAD COMPANY, Appellant,**

v.

**Juan MUNOZ and Maria Munoz, Appellees.**

**No. 18760.**

United States Court of Appeals
Ninth Circuit.

Jan. 6, 1964.

Edward C. Renwick, M. W. Vorkink, W. I. Kennedy and R. D. McClain, Los Angeles, Cal., for appellant.

Irving H. Green and Eliot Bernard Feldman, Los Angeles, Cal., for appellees.

Before CHAMBERS, ORR and BARNES, Circuit Judges.

BARNES, Circuit Judge.

This is an appeal by Union Pacific Railroad Company from a judgment in favor of appellees for personal injuries in a diversity action. 28 U.S.C. § 1332 (a) (1).

The sole question on appeal is whether the jury should have been instructed on the doctrine of last clear chance. It was instructed as follows:

"A certain reasoning process that we sometimes call to our aid in analyzing the facts of an accident case is known as the Doctrine of Last Clear Chance. It is permissible to use the doctrine only after we first find, and you may not use it unless and until you first shall have found, that in the events leading up to the accident in question both the plaintiff and defendant were negligent.

"The Doctrine of Last Clear Chance may be invoked if, and only if, you find from the evidence:

"First: That the plaintiff was in a position of danger and, by his own negligence became unable to escape from such position by the use of ordinary care, either because it became physically impossible for him to escape or because he was totally unaware of the danger;

"Second: That defendant knew that plaintiff was in a position of danger and further knew, or in the exercise of ordinary care should have known, that plaintiff was unable to escape therefrom;

"Third: That thereafter defendant had the last clear chance to avoid the accident by the exercise of ordinary care but failed to exercise such last clear chance, and the accident occurred as a proximate result of such failure.

"If all the conditions just mentioned are found by you to have existed with respect to the accident in question, then you must find against the defense of contributory negligence, because under such conditions the law holds the defendant liable for any injury suffered by the plaintiff and proximately resulting from the accident, despite the negligence of the plaintiff."

Appellant is not critical of the language used in the instruction, and raises no question as to it. Cf: Brandelius v. City and County of San Francisco, 1957, 47 Cal.2d 729, 306 P.2d 432, at 439.

Appellant properly protected its record below by making objections, all timely, to the giving of the instruction. We find appellees' contention to the contrary to be without merit.

Appellant concedes (for the purpose of this appeal) that there is substantial evidence to support the first two elements of the doctrine (that plaintiff was inextricably in a position of danger, and that defendant knew or should have known plaintiff was in such position of danger), but contends there was no substantial evidence to support the third element.

■■ We shall assume that "substantial evidence," as used herein, is, as defendant-appellant urges it must be, evidence that is reasonable, credible, and of solid value. Cf: Doran v. City and County of San Francisco, 1955, 44 Cal.2d 477, 283 P.2d 1. Appellees urge the rule that the instruction is properly given if there is "any" evidence, i. e., the evidence need not be "substantial." Appellees rely on Rabago v. Meraz, 1963, 60 A.C.No. 1, p. 1, 31 Cal.Rptr. 777, 383 P.2d 129. That is not a case involving the last clear chance doctrine, but involved ungiven but requested instructions concerning plaintiff's claim she was neither "guest" nor "passenger for hire," but an "involuntary occupant" of an automobile. The case had been both pleaded and tried upon the theory there was an issue as to plaintiff's status as an involuntary passenger. When Justice Peters stated: "It

is well settled that it is not error to give an instruction on a theory advanced by a party if there is any evidence on which to base it," we doubt that he intended to set up any new or different California rule. "Any evidence" means evidence which has "probative force;" is of "ponderable legal significance;" and is "reasonable * * *, credible, and of solid value." Dyer v. Knue, 1960, 186 Cal. App.2d 348, 8 Cal.Rptr. 753. Justice Peters never went so far as to state the evidence need *not* be "substantial." We believe that the evidence to support the giving of the instruction must be "substantial." Thus we accept the California rule to be as delineated in Doran v. City and County of San Francisco, supra.

■ Before considering the facts, we first remind ourselves of other ground rules.

Where the jury has found for the plaintiff,

"Under California law plaintiff's evidence must be viewed in its most favorable light and the plaintiff must be given the benefit of all favorable inferences a jury would be entitled to draw from the evidence."

We further note that appellant concedes that in determining on appeal whether an instruction on the doctrine should have been given, the evidence is viewed most favorably to the contention that the doctrine is applicable. Warren v. Ubungen, 1960, 177 Cal.App.2d 605, 2 Cal.Rptr. 411.

We quote from Doran v. City and County of San Francisco, supra:

"The question of whether there is any substantial evidence, conflicting or otherwise, which could justify the application of the last clear chance doctrine in a given case, is a question of law; and in the absence of such evidence, it is error for the trial court to instruct the jury concerning that doctrine. Wallis v. Southern Pacific Co., 184 Cal. 662, 672, 195 P. 408, 15 A.L.R. 117; Rodabaugh v. Tekus, supra, 39 Cal.2d 290, 297, 246

P.2d 663; Johnson v. Sacramento Northern Ry., 54 Cal.App.2d 528, 543, 129 P.2d 503; Dalley v. Williams, 73 Cal.App.2d 427, 431–432, 166 P.2d 595. On the other hand, if there is such substantial evidence, conflicting or otherwise, the question of whether the defendant should be held to have had a last clear chance to avoid the accident is a question of fact to be determined by the jury under appropriate instructions. Girdner v. Union Oil Co., supra, 216 Cal. 197, 204, 13 P.2d 913; Center v. Yellow Cab Co., supra, 216 Cal. 205, 208, 13 P.2d 918; Selinsky v. Olsen, supra, 38 Cal.2d 102, 106, 237 P.2d 645; Peterson v. Burkhalter, supra, 38 Cal.2d 107, 113, 237 P.2d 977; Daniels v. City and County of San Francisco, supra, 40 Cal.2d 614, 619, 622–623, 255 P.2d 785; Sills v. Los Angeles Transit Lines, supra, 40 Cal.2d 630, 635–636, 638, 255 P.2d 795.

"While the determination of the question of law above mentioned is not free from difficulty in certain border-line cases, the cited authorities show that the courts have not hesitated to hold that the doctrine could be applied whenever it may be fairly said that there is substantial evidence, conflicting or otherwise, upon which to base a finding of the presence of each of the required elements. These authorities recognize, however, that it is only the exceptional case to which the doctrine may be applied, and that the mere fact that there is ample evidence to show that a defendant is negligent, without substantial evidence of the existence of the other required elements, will not warrant the application of the last clear chance doctrine. Rodabaugh v. Tekus, supra, 39 Cal.2d 290, 293, 246 P.2d 663."

We turn to the facts and quote them in the margin as stated by appellant.[1]

---

1. "The plaintiff's testimony was that he was relieved to go to supper at about 7:30 P.M., walked out of the building in which he was working onto the dock and across the dock to the top of the ladder. At this time he looked to his left and saw the train 100–150 feet away standing still. While looking at the train, he saw a man get off the end of the closest railroad car and stand down on the ground. He then looked to his right and saw a man standing four or five feet away with a lantern in his hand with whom he had a brief conversation concerning the weather. He marked on Defendant's Exhibits F and J the spot where this man was standing at the time. He then looked at the train again and the train had not moved and was still 100–150 feet away. Plaintiff was shown the photograph, Defendant's Exhibit I, and testified that he went down the ladder in the same way that the man is shown going down the ladder in the photograph. When he got to the ground he turned his head to the right and saw the train standing still, in the same position that it had been in when he looked previously while at the top of the ladder, and still 100–150 feet away. After looking at the train, he turned his body around toward the left so that he was facing toward the tracks. After turning around, but before walking forward, he looked at the train again, and it was still

100–150 feet away, in the same place. Before starting to walk across the tracks he was standing within one foot of the ladder. He waited one or two seconds before starting to walk forward across the tracks at a normal, regular speed. He took two or three steps forward and heard the man on his right, with whom he had had the conversation about the weather, yell 'Go, Go'. He turned to look at the man who was yelling, took one more step and the train hit him on the hip and knocked him down. The train ran over both of his legs. He did not see the train at all when it was moving.

"The engineer, William Malone, testified that he was operating the switch engine at the time of the accident, sitting on the right side of the engine. The engine was pushing four gondolas, with its headlight burning in the dim position. The train was traveling approximately four miles per hour, and did not change speed after entering the Continental Can premises until the brakes were applied just before the accident. He was following lantern signals given by engine foreman Baker, who was down by the electric door. He first saw the plaintiff when the plaintiff was up on the loading platform approximately eight feet from the edge of the ramp and walking toward the edge of the ramp. Plaintiff was approximately ten feet south of the ladder when at the edge of the plat-

form. He testified that the plaintiff 'put one hand down on the ramp, on the cement and stepped off of the platform'. He states that the plaintiff went out of sight after he stepped off the platform and that he stopped the train immediately. He stated that he got a violent stop signal from engine foreman Baker just at the time the plaintiff started to step off the platform. He estimated that the leading edge of the train was eight or ten feet from the ladder at the time he saw the plaintiff for the first time, and was approximately eight feet from the ladder when he saw the plaintiff step off the platform. He stated that when he first saw the plaintiff he had no reason to believe plaintiff would attempt to cross the tracks in front of the train, that he had no idea that Mr. Munoz would go forward, and he really fully expected him to stop. He estimated that the train traveled approximately five or six feet after the brakes were applied. He stated that on other occasions prior to the accident he had seen Continental Can employees wait on the dock for the train to go by.

"James Trembley testified that he was a switchman riding on the front edge of the front car as the train entered the Continental Can premises, but that he got down to the ground at a point about 300 feet from the electric door and remained standing at that point, between the train and the dock. He estimated the speed of the train at three or four miles per hour. He stated that he saw the plaintiff step off the dock in front of the train at a time when the front end of the train was 10 or 15 feet from the ladder. He states that the plaintiff was facing away from the dock and toward the train when he stepped off and that plaintiff may have touched one of the steps of the ladder with the back of his heel as he descended. He did not see the plaintiff at any time up on the platform. He states that engine foreman Baker was standing 15 to 20 feet inside the electric door before the accident and that at the time the plaintiff stepped off of the platform he observed Mr. Baker give a violent stop sign signal. He also heard Mr. Baker yelling at the same time. At the time the accident occurred, the engine had already passed by him and the engineer could not see him, therefore.

"The testimony of Jack Baker was that he was the engine foreman on the switch crew on the night of the accident and that he remained at the area of the electric door when the switch engine pulled out of the Continental Can premises with the loaded cars. As the switch engine returned into the Continental premises pushing the empty gondola cars, he was standing just outside of the electric door. As the train proceeded toward him, he walked backwards inside the building. The accident occurred between 7:00 and 7:30 and the lighting conditions were dark although there were electric lights located overhead on the dock. He observed switchman Trembley riding on the lead car carrying a white lantern and then get off of the train and lean up against the dock. He was approximately 60 feet inside the electric doors, standing on the ground when he first saw the plaintiff, Juan Munoz. He saw plaintiff one step before he reached the edge of the platform; that plaintiff took one step, and then one step down and he was on the ground. The plaintiff came down the steps in a hurried manner. He saw plaintiff take just one step on the platform and plaintiff was moving fast. Plaintiff did not say anything to him before descending the ladder. Plaintiff did not stop at the top of the ladder for any observable period of time. The plaintiff did not look toward the train while standing at the top of the ladder. While plaintiff was coming down the steps, Baker gave a violent stop sign with his lantern and started hollering 'No, No.' Baker then stated that the plaintiff had 'just reached the ground' when the stop sign and oral warnings were given by Baker. He stated that the train was 10 or 12 feet from the ladder when he first saw plaintiff. He stated that after the plaintiff got to the ground he did not look either at the train or toward Baker, but walked forward across the tracks looking down at the ground. There is sufficient space at the bottom of the ladder for a person to stand on the ground and allow a train to pass by, and he himself has stood in that location while trains passed by. The plaintiff took two steps across the tracks and was then struck by the train. The train traveled approximately four to six feet after hitting the plaintiff.

"Shirley Lawton, a Continental Can employee, was walking from Building O across the outside truck yard and up a ramp into Building H. She saw the train come into the Continental Can premises and proceed alongside of the dock. After she turned to go up the ramp into Building H, she was not able to see the train since her back was toward it. As she walked up the ramp she saw engine foreman Baker just inside the electric doors standing on the track walking backwards into the building. He was waving the lantern back and forth. She heard him

There were four eyewitnesses to the accident.[2] They were the plaintiff, Juan Munoz, the engineer William Malone, the switchman James Trembley, and the engine foreman Jack Baker.

Their testimony was not the same. The plaintiff testified that he walked across the dock, looked at the train which he said was standing still about one hundred to one hundred and fifty feet away, had about a ten word conversation with the train foreman Baker, stepped off the platform onto and down the ladder, turned and saw the train still standing still, took two to four steps toward the other side of the tracks, turned towards Baker who was yelling something, and then took one more step before being hit by the train. This story seems unbelievable if one believes that he did look at the train *after reaching the bottom* and that it was still standing still. But the jury could have disbelieved part of his testimony and believed the rest.

Moreover, the other eyewitnesses, all employees of the railroad, did not agree as to the events. Engineer Malone said the leading edge of the train was eight feet from the ladder when the plaintiff stepped off the platform and that the train could be stopped in five to six feet at the speed it was traveling. Switchman Trembley said the leading edge of the train was ten to fifteen feet from the ladder when the plaintiff stepped off, and on cross-examination he said it might have been twenty feet. Baker testified that the train was ten to twelve feet from the ladder when plaintiff stepped off the platform, and that the train traveled four to six feet after hitting plaintiff.

Thus there existed an arguable question of fact whether defendant could or could not have stopped the train in time to avoid the accident, after knowledge of plaintiff's dangerous position.

In addition, engineer Malone was charged by plaintiff with failure to blow the train's whistle.

As appellee's brief puts it:

"It was the duty of all the crew to look out for pedestrians; Malone's duty to either blow the whistle, or put brakes on, or both. If he no longer sees a signal, he stops.

"He admitted that he did not blow the whistle at any time before the accident; the brakes are applied by pulling a lever with a left hand; the whistle is right by the brake valve; he had another hand that was not being used; to blow the whistle, all he had to do was pull the whistle cord which is 'right from the top of the cab right by my left shoulder' and there was no physical reason why he could not blow the whistle; that the whistle operates instantly.

"He admitted that he could have blown the whistle when he saw Munoz on the platform walking toward the edge and that he could have blown it before that or at any time."

Malone "first saw Munoz" when Munoz was on the platform eight feet from the edge of the ramp, eight to ten feet south of the ladder, and walking towards the edge of the dock. He saw Munoz walk for eight feet to the edge of the platform.

Should Malone have anticipated that Munoz would continue onto the tracks into a position of danger, or stay on the platform in safety? If Munoz was in a position of safety before he stepped off the platform, but was at that instant in a position of danger, could the train have been stopped in time to avoid the accident? If plaintiff was in a position of safety until he stepped away from the *bottom* of the ladder, and was then in a position of danger, could the train have been stopped in time?

---

shout 'No, No, No' and saw him start to wave his lantern. She then turned around and saw that the accident had occurred."

2. This excludes witnesses Lawton, Whited, Fischer, Williams, Carlson, Montoya, Grigg and Balsairch.

254

These are very close questions, and they emphasize what Brandelius, supra, calls "the all important factor—the time element." In other words, says that case:

> "If the doctrine is to be applied and a recovery is to be permitted despite the contributory negligence of the injured party, there must be substantial evidence to show that the defendant had a last clear chance to avoid the accident by the use of ordinary care following the time that the injured party had lost any similar opportunity to avoid the accident by the use of such care." 306 P.2d at 438.

While we again think it a very close question whether the plaintiff had lost opportunity to avoid the accident (by stopping in his approach to the ladder, or jumping, or running, or flattening himself against the platform after he descended), defendant admits, "Once plaintiff left his position of safety at the bottom of the ladder and began to walk forward across the tracks, his collision with the train was inevitable." (Op.Br. p. 24.) Moreover, since both the engineer and the train foreman testified that they did all they could to stop the train as soon *as they saw plaintiff step off the platform,* the jury could have inferred that both believed that the plaintiff left his position of safety as soon as he stepped off the platform, and started down the ladder.

■ On this record, we cannot as a matter of law, hold that the plaintiff *could* have avoided the accident in the exercise of ordinary care up until the time that the train crew had a last clear chance to avoid the accident. On this record we hold that the questions present to the court a situation where it cannot be said the trial court erred as a matter of law in submitting the issue of last clear chance to the jury.

This is primarily because we cannot determine whom the jury believes, or how much of each witness' testimony is ac-

cepted and what rejected, nor how much weight is attached to each.

■ As was said by this court in a last clear chance case decided in 1954, setting forth California law:

> "The credibility of a witness and the weight to be accorded his testimony are questions directed to the trier of fact who may accept *all* or *part* of the testimony of any witness it believes to be true or may reject *all* or *any part* of which it believes to be untrue. * * * Sills v. Los Angeles Transit Lines, supra, 40 Cal.2d at page 638, 255 P.2d at page 800. * * * " Churchill v. Southern Pac. Co., 215 F.2d 657 at 661.[3]

We likewise therein quoted (the same case) as follows:

> "Thus, while the motorman testified that he immediately applied his brakes when he saw the automobile on the track ahead, the jury might have disbelieved him and accepted plaintiff's statement that there was no decrease in the speed of the approaching streetcar at any time prior to the impact." (255 P.2d at 800.)

We then said:

> "Since the third element of the doctrine was reasonably raised by the plaintiff's evidence, this element became a question of fact for the jury. 'Whether or not the doctrine of last clear chance applies in a particular case depends entirely on existence or non-existence of the elements necessary to bring it into play. Such question is controlled by factual circumstances and must ordinarily be resolved by the fact-finder.' Daniels v. City and County of San Francisco, supra [40 Cal.2d 614, 255 P.2d 788]." (215 F.2d at 663.)

Appellees raise one other minor point, which we find to have doubtful merit, and which need not here be reached in view of our determination of the principal question.

Affirmed.

3. We note there we reversed on failure to instruct the jury on the last clear chance doctrine.